This is a termination of parental rights case.
The Juvenile Court of Tuscaloosa County ordered the permanent termination of all the parental rights of the mother, Denise Columbus, and the father, Michael Moore, in their child Adam Columbus. Custody was awarded to the Department of Human Resources (Department) so that permanent arrangements could be made for Adam. Both mother and father appeal. We affirm.
The natural parents have a prima facie right to the custody of their child, Fitzgerald v. Fitzgerald, 490 So.2d 4
(Ala.Civ.App. 1986), which right can be overcome only by clear and convincing evidence that the best interests of the child will be served only by being permanently removed from parental custody. Johnson v. State, 485 So.2d 1185
(Ala.Civ.App. 1986). In order to terminate parental rights, the trial court must apply a two-pronged test. First, the court must find from clear and convincing evidence that the child is dependent. § 12-15-65(e), Code 1975. See, Brown v.Alabama Department of Pensions Security, 473 So.2d 533
(Ala.Civ.App. 1985). Second, the court must determine whether there are available less drastic alternatives than termination of parental rights. Matter of Colbert, 474 So.2d 1143
(Ala.Civ.App. 1985).
The Child Protection Act of 1984, codified at sections26-18-1 to -10, Code 1975, authorizes a juvenile court to terminate parental rights if it finds from clear and convincing evidence that a parent is unwilling or unable to satisfy his responsibilities to his child. This section lists several factors which may be considered by the court in finding a child dependent, thus authorizing termination of parental rights.Matter of Colbert, supra; § 26-18-7(a), Code 1975. Among the factors listed are the following:
 "(1) That the parents have abandoned the child, as herein defined;
 "(2) Emotional illness, mental illness or mental deficiency of the parent . . . of such duration or nature as to render the parent unable to care for needs of the child."
§ 26-18-7(a), Code 1975. We hasten to note that the Child Protection Act is a codification of only one of the grounds upon which a court can determine that a child is dependent and thus in need of a decision as to his welfare. Matter ofColbert, supra. In addition to a finding of dependency, the court must also consider whether there are less drastic alternatives than termination of parental rights. Brown v.Alabama Department of Pensions *Page 421 Security, supra. When evidence is presented ore tenus, the trial court's judgment will be presumed correct and will not be set aside on appeal absent a showing that it is so unsupported by the evidence as to be considered plainly and palpably wrong. Wallace v. Jefferson County Department ofPensions Security, 501 So.2d 473 (Ala.Civ.App. 1986).
The mother contends that the ore tenus rule should not be applied when determining whether parental rights should be terminated. We do not find merit in this argument. The ore tenus rule is merely a standard of review that the appellate courts use to review factual determinations of the trial court and not the burden of persuasion. The burden of proof required is clear and convincing evidence as mandated by statute in Alabama. See, §§ 12-15-65(e) and 26-18-7(a), Code 1975. The appellate court must find, within the record, sufficient evidence that is clear and convincing in order to affirm.
The pertinent facts reveal that Denise Columbus gave birth to Adam Columbus on June 25, 1979 without identifying the father. The Department obtained custody of Adam when Youth Aid found the ten-day-old child alone and unattended. The mother was unemployed, having no visible means of support other than food stamps. The Department worked with the mother on employment motivation while Adam was in foster care and provided visitation between mother and child, as well as other rehabilitative services so that custody of Adam could be returned to her.
In April of 1981 the mother regained physical custody of Adam. The Department retained legal custody of Adam and supervised his return home. From April 1981 until August 1981 the Department provided four different day care facilities for Adam, none of which was suitable to the mother. The mother made several moves without notifying the Department as required, and she missed food stamp appointments which resulted in a temporary loss of food stamps. In August 1981 the Department visited the home to discuss with the mother these various complaints. The case worker determined Adam was improperly supervised and subsequently removed him from the home.
During the period of foster care between August 1981 and July 1982, the Department provided the mother with counseling services and visitation, and encouraged the mother to join Parents Anonymous, which she did. The Department concluded that the child could be returned to the custody of the mother in July 1982. Adam remained in the mother's custody until October 1985 with one exception during August of 1982 when babysitters discovered red marks on Adam's face, hands, and ears, and found his hands and ears swollen. Youth Aid was notified and Adam was rushed to the hospital. Adam had suffered from an allergic reaction to an unknown type of bug bite. Further investigation of the incident revealed that the mother had been aware of the marks prior to leaving the child. Adam was placed by the Department in shelter care for medical observation.
After this incident, custody was returned to the mother in late 1982 with support services of an early childhood day care program, Parents Anonymous, and the services of a doctor who did research on noncompliant children and was contacted to help the mother with Adam. During the spring of 1983 the mother withdrew Adam from the early childhood day care, which was one of the support system services. During the rest of 1983 and 1984 the Department provided periodic services to Adam and his mother, but contact was very limited. In May 1985 day care was requested by the mother, specifically the services of Connie Turner, who had been Adam's foster care mother. The Department made the arrangements, agreeing to pay Ms. Turner $95 per month, while the mother contributed $5 per week. Day care began in June but was terminated in July due to the mother's failure to pay the copayment.
In September 1985 Adam's school officials contacted Adam's caseworker and expressed concern about his development. They also indicated that Adam had said he *Page 422 
was alone at night frequently. The case-worker contacted the mother regarding these concerns and found the mother evasive and uncooperative in providing necessary information. The caseworker explained to the mother the gravity of leaving the child alone at night and informed her that if the child were found alone again she would lose custody of him. The Department, upon receipt of an anonymous call, sent Youth Aid to Adam's home. With the assistance of the apartment manager, Youth Aid entered the apartment at 9:30 p.m. to find Adam unattended.
The Department filed a petition for custody and placed the child with his foster mother, Ms. Turner. The Department also asked for termination of parental rights of the mother. This decision was based on six years of rehabilitative efforts with the mother.
At trial there was testimony from a school counselor who had worked with Adam from October 1985 through May 1986 that Adam was a fearful child. The counselor testified that Adam's behavior was more fearful than is normally exhibited by the typical child changing schools or starting school for the first time.
When questioned about Adam's improvement one year after being placed in foster care, the counselor replied that he showed significant improvement in his behavior, had a higher self esteem, was better able to express his feelings, and was involved in a special privilege program at school. As to Adam's emotional attachment with his mother, the counselor testified that Adam was fearful of his mother and often made negative remarks about her.
The record further reveals that Adam was tested by the school's psychometrist, who does psychological evaluations on children referred for special education services. Adam's scores indicated he was educably mentally retarded. The psychometrist's opinion was that Adam qualified for the special class for children with emotional problems; however, he was not placed in this class since it was believed that the change would be more detrimental than beneficial to him. Adam was tested again prior to trial. He qualified for, and was placed in, a class for children with emotional conflicts.
In November 1985 Adam was referred to Dr. Karen Turnbow at Indian Rivers Mental Health Center because he was disruptive in school and exhibited inappropriate speech, underdeveloped communication skills, and poor social skills. Dr. Turnbow's initial evaluation of Adam indicated that he was immature and aggressive, had poor impulse control, had limited verbal skills, and had difficulty acknowledging and expressing his feelings. He was also anxious, oppositional, and demanding, as well as having difficulty trusting others.
Dr. Turnbow indicated that Adam resembled a child that had been emotionally and culturally deprived. Adam has since improved in his abilities to relate to others, is not as anxious, has better speech development, and is better able to express his feelings, all of which Dr. Turnbow attributes to the enriched environment of his foster care home. Regarding Adam's emotional attachment to his mother, Dr. Turnbow stated that Adam frequently denies that Denise Columbus is his mother. As to Adam's future needs, Dr. Turnbow stated that Adam would need continued therapy, and a nurturing, nonpunitive environment.
Adam is a biracial child. His parents were not married to each other; however, the father has been married once and anticipates a second marriage. The father had very limited contact with Adam, having seen the child only twice. The child does not know his father, nor has the father provided any support, either financial or other otherwise, for the welfare of Adam. The father spent time in Tuscaloosa but did not attempt to visit the child or inquire as to his well-being. At the time of the proceedings, the father resided with his mother, was unemployed, and relied on his family for his support.
The appellants argue that the evidence was not so clear and convincing as to justify the termination of their parental rights. We disagree. *Page 423 
One of the factors to be considered by a court in deciding whether a parent is unwilling to discharge his responsibility for a child is whether that parent has abandoned his child. Section 26-18-7(a)(1), Code 1975. Abandonment is defined in the Child Protection Act as follows:
 "A voluntary and intentional relinquishment of the custody of a child by a parent, or a withholding from the child, without good cause or excuse, by the parent, of his presence, care, love, protection, maintenance or the opportunity for the display of filial affection, or the failure to claim the rights of a parent, or failure to perform the duties of a parent."
§ 26-18-3(1), Code 1975.
The record reveals that the father did not legitimate Adam until 1986, just prior to the termination proceeding. The father testified that he had seen Adam only twice during the child's lifetime, although there was testimony that he knew of Adam's existence and that he knew he was Adam's natural father. He did not support the child either financially or emotionally. Thus, we find that the court had before it ample evidence of abandonment of the child by the father. Thus, the child is dependent.
The father also argues that the trial court erred by failing to find a less drastic alternative to termination of his parental rights.
As noted above, a trial court, in considering a request for termination of parental rights, should ascertain whether there are available less drastic means than termination of parental rights.
The record before us reveals that the father's grandmother was considered but her advanced age precluded her from being a viable alternative. Matter of Burnett, 469 So.2d 627
(Ala.Civ.App. 1985).
The father's sister was also considered as a possible custodian of the child. However, the evidence is in conflict as to the availability of the sister as an alternative to termination of parental rights.
There was evidence that the sister had five children of her own and that she and her husband had full time jobs. Moreover, there was evidence that the sister was unsure of her ability to cope with the child's special needs. Consequently, we do not find that the trial court's determination that there was no viable alternative to termination of parental rights is plainly and palpably wrong. Brand v. Alabama Department of Pensions Security, 479 So.2d 66 (Ala.Civ.App. 1985).
The mother also argues that the trial court erred in terminating her parental rights. Again, we disagree with the parent's contention.
The record reveals that the Department had worked with the mother for six years in an attempt to enable her to be a responsible parent. The rehabilitation efforts of the Department may be considered by a juvenile court in a termination of parental rights case. § 26-18-7(a)(6), Code 1975.
The mother has consistently shown an inability to provide proper supervisory care for Adam. Adam was taken from his mother at ten days old because he was left alone and unattended. He was taken a second time because he was found wandering aimlessly in the apartment while his mother slept. The mother had trouble finding day care with which she was satisfied since she insisted it be a black day care center. After reports that Adam was again being left alone, the Department warned the mother that she would lose custody of Adam if he were found alone. Adam was again found alone at night and custody was taken from the mother and this petition to terminate followed. We consider this to be clear and convincing evidence that the mother is unable to provide appropriate supervision for her child and that the Department's efforts to rehabilitate through counseling, Parents Anonymous, and other services have failed.
In deciding whether parental rights should be terminated, the court may also consider the emotional illness of a parent under section 26-18-7(a)(2), Code 1975, which provides: "(2) Emotional illness, mental illness or mental deficiency of the *Page 424 
parent . . . of such duration or nature as to render the parent unable to care for the needs of the child." §26-18-7(a)(2), Code 1975. The mother says that the trial court, in considering her emotional illness, relied upon inadmissible medical records relative to her past mental health, predating the birth of Adam. The court admitted these records from Bryce Hospital over the objections of the mother.
The mother contends that the court violated her psychologist-patient privilege by admitting these records into evidence over her objection. However, we find that the records were properly admitted under the guidelines established inMatter of Von Goyt, 461 So.2d 821 (Ala.Civ.App. 1984).
 "We recognize that the psychologist-patient privilege is an important one, not to be easily disregarded. We do not seek to discourage troubled parents from obtaining professional help. However, we are convinced that where the issue of the mental state of a party to a custody suit is clearly in controversy, and a proper resolution of the custody issue requires disclosure of privileged medical records, the psychologist-patient privilege must yield."
Von Goyt, supra. The rationale of the court is that in child custody cases the court cannot determine the best interests of the child unless it considers the physical, financial, or emotional condition of the person to be charged with the child's care and custody. Von Goyt, supra. In making this determination, the court may consider the past history of the mother as well as her present condition.Wallace, supra.
Dr. Jerry Hart testified that the mother is severely handicapped in her ability to assess and cope with interpersonal situations and misperceives situations; she is easily frustrated and reacts with acting out behavior. The doctor said the mother's behavior is consistent with a disorder presently referred to as bipolar affective disorder, formerly known as manic depressive illness. The doctor then testified that the information contained in the mother's medical records is consistent with her present emotional state. The mother's medical records were properly admitted.
The mother also elicited testimony from David Franklin, coordinator of long-term care services at Indian Rivers Mental Health Center, regarding her present mental status. He testified that the mother's condition was presently stabilized through medication and that she interacts reasonably well.
On cross-examination, Mr. Franklin stated he was an able to comment on her parenting ability generally, but he did say that during an acute phase of her illness she would be an able to parent. If she did not follow through with treatment, it is unlikely that she would be able to meet normal parenting responsibilities.
The court then asked Mr. Franklin about the link between the mental condition of the mother and the mental and emotional condition of Adam. The witness indicated that the mother's illness could cause problems for the child. His testimony was to the effect that the child would exhibit symptoms of being fearful of being left alone, exhibiting great reluctance to discuss his problems, and have severe outbursts of temperament. He indicated that if the situation of the child were not altered it could worsen.
The expert testimony heard by the court, including that set out above, presents clear and convincing evidence that the mother's mental condition was of such a nature as to render her an able to care for her child and that the child's needs would served by returning his custody to the mother. Thus, the trial court did not err in determining that the child was dependent and that his best interests could be served by terminating his mother's parental rights.
We would also know that the mother failed to present any viable alternatives to termination of parental rights.
Both mother and father content that the judgment of the trial court should be reversed on the ground that the Department failed to follow its own rules and regulations prior to petitioning the court for termination of parental rights. The mother *Page 425 
contends that she was not presented with a case plan when Adam was placed in foster care in 1985. The father claims that the Department failed to initiate efforts to locate him, the absent parent, during their dealings with Adam. Both parents assert that this failure to follow the agency's internal procedures constitutes a violation of their due process rights, both substantive and procedural, under the fourteenth amendment of the United States Constitution. We disagree.
As we said in Pignolet v. State Department of Pensions Security, 489 So.2d 588 (Ala.Civ.App. 1986), the Department is required to follow proper procedures in parental rights termination cases and is subject to the AAPA. However, in the case at bar, as was the situation in Pignolet, the court terminates parental rights and the Department merely suggests to the court that parental rights should be terminated. The Department has no authority to terminate parental rights, and its dealings with the mother and father prior to a petition being filed were never challenged by them in an administrative hearing conducted in accordance with the AAPA. Consequently, we find it unnecessary to address the question of whether the Department denied the appellants due process. The record reflects due process was accorded the appellants in the court proceedings to terminate their parental rights.
The mother also contends that the court committed reversible error when it referred to the race of the child in its denial of the motion for new trial. We disagree. This statement was not made as part of the judgment of the case but, rather, was made when denying the motion for new trial. The comment in context was merely a factual observation of the court and could not be considered as a basis for its decision.
 "Furthermore, although we think the decree of the trial court giving its reasons [was] a proper basis for its conclusions, statements by the trial judge showing the basis on which his conclusion of fact is founded are not part of the judgment.
 "The question for our decision is whether the decree of the trial court is correct, not whether the ground on which the trial court professed to proceed is tenable."
Skinner v. Todd, 283 Ala. 279, 215 So.2d 721 (1968) (citations omitted). Thus, we do not find the mention of the child's race to be reversible error.
The evidence in the record established that the conditions of both the mother and the father are not likely to change in the future and that these conditions render the parents unable to discharge their parental responsibilities. The record further indicates that there is no less drastic viable alternative than termination of parental rights. Further, under the 1984 Child Protection Act and the factors discussed in this opinion, we hold that the trial court's decision to terminate the parental rights of both the mother and the father is supported by clear and convincing evidence. Its judgment is affirmed.
AFFIRMED.
HOLMES and INGRAM, JJ., concur.