[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 271 
E.A., the mother, and J.A., the father, appeal from the judgment of the Calhoun Juvenile Court terminating their parental rights to J.A., a minor child born on March 4, 2000 (juvenile court case no. JU-06-152.02), and A.A., a minor child born on August 17, 2003 (juvenile court case no. JU-06-153.02). We affirm.
 Procedural History
The Calhoun County Department of Human Resources ("DHR") obtained temporary custody of J.A. and A.A. in February 2006 as a result of its investigation of a child-abuse and neglect report involving the parents. On June 12, 2007, DHR filed petitions to terminate the parental rights of the mother and the father. A guardian ad litem was appointed to represent the interests of the children. Because DHR had no information as to the location of the mother or the father at that time, the mother and the father were served with notice of the termination petitions by publication.
The juvenile court conducted ore tenus proceedings on the termination petitions on September 24, 2007. On November 13, 2007, the juvenile court entered its judgment terminating the mother's and the father's parental rights to J.A. and A.A. In its judgment, the juvenile court concluded that the children had previously been determined to be dependent, that the mother and the father were unable or unwilling to discharge their parental responsibilities to and for the children, that the mother's and the father's conditions or conduct were such that they were unable to properly care for the children and that such conditions or conduct were unlikely to change in the foreseeable future, that reasonable efforts had been made to reunite the mother and the father with the children but those efforts had failed, that no viable alternatives to termination existed, and that termination of the mother's and the father's parental rights was in the best interests of the children.
The father filed a motion to alter, amend, or vacate the judgment. The juvenile court denied that motion. The father and the mother timely appealed.[1]
 Factual Background
At the September 24, 2007, termination hearing, the following witnesses testified: Tiffany Garrett, the DHR social worker assigned to this case; S.A., the foster mother of J.A. and A.A.; Katina Houston, a counselor employed with Serenity Counseling Services; the mother; and U.B., the children's maternal grandmother. The father did not appear at the termination hearing.
Tiffany Garrett testified that this case began after a child-abuse and neglect report *Page 272 
involving the parents was made in February 2006. DHR received a report that the mother had left the children with a babysitter on a Friday evening and that the mother was scheduled to return on Saturday. The mother, however, did not return on Saturday. Neither the mother nor the father nor any other relative could be reached, and the children were brought into DHR's care on Sunday. A shelter-care hearing was held the next day; the mother and the father were present for that hearing. The mother submitted to a drug screen immediately after that hearing; that test was positive for marijuana and cocaine. The father left the courthouse before a drug screen could be administered to him.
DHR developed an individualized service plan ("ISP") for the parents immediately after the shelter-care hearing. According to Garrett, DHR offered the mother family support, visitation, random drug screens, and counseling. A psychological assessment of the mother was performed; as a result of that assessment, counseling was recommended for the mother. Because the mother reported that domestic violence was an issue in the family, DHR recommended that both the mother and the father complete domestic-violence assessments.
Garrett took over the case in March 2006 and began working with the parents to create a reunification plan. According to Garrett, as part of that reunification plan, both parents agreed that they would keep DHR informed of their current addresses, telephone numbers, and employment status; that they would cooperate in a nonhostile manner with DHR and all service providers; that they would maintain safe, stable, and clean housing that would be appropriate for the children; that they would have available, reliable transportation; and that they would visit with the children as scheduled. Both parents agreed that they would not violate any laws and that they would notify DHR of any relatives who were potential resources for the children. Both parents also agreed that they would submit to random drug screens at the request of their counselors or DHR. Both parents agreed that they would submit to psychological evaluations with Dr. David Wilson and that they would follow all recommendations made by Dr. Wilson. The mother agreed that she would participate in counseling with "Covenant Services" and that she would follow all recommendations made by her counselors. According to Garrett, "I agreed that I would follow up with everything and provide [the parents] with the needed services and be sure that they are able to do them."
Garrett testified that in February, March, and April 2006, the mother was provided family-support services, individual counseling at Covenant Services, visitation with the children, and transportation to help her locate housing and employment. The mother began her counseling, but she did not locate housing. The mother's employment situation was not stable; she held at least three different jobs during this period.
In April 2006, the mother indicated that she was moving to Florida where she had relatives; the mother stated that she had nowhere else to go. Garrett discouraged the mother from moving to Florida and told her that she could stay at the local Salvation Army facility and continue to receive services from DHR; Garrett gave the mother applications for government-assisted housing, but the mother indicated that she would not live "in the projects."
The mother moved to Florida in April 2006. In Florida, the mother voluntarily enrolled in a 12-month drug-rehabilitation program administered by an entity referred *Page 273 
to in the record as "First Assembly Ministries." The mother began the program in April 2006 and left the program in July; she did not complete the First Assembly Ministries program.
According to Garrett, the mother left Florida and moved to the Birmingham area at the end of July 2006. She apparently contacted Garrett upon her return to Alabama because Garrett referred the mother to Dr. Debra Atchison, a Birmingham-based provider, to again undergo counseling. Although the mother was referred to Dr. Atchison in July 2006, the mother did not attend a session with Dr. Atchison until January 2007. The mother met with Dr. Atchison once and then did not return.
Garrett stated that, on May 25, 2006, while the mother was in Florida, DHR returned the children to the father's custody. Garrett testified that, at that time, the father had a safe and stable home, had produced negative drug screens, was visiting the children on a weekly basis, and was cooperating with DHR. DHR had returned the children with the stipulation that the mother not reside in the father's home because of the mother's drug issues, because the mother had not followed DHR's recommendations, and because of the domestic-violence issues between the mother and the father.[2] DHR had amended their ISP to require that the father supervise the mother's visitation with the children; the mother was given visitation at the father's discretion. The father had reported to Garrett that the mother was not visiting the children regularly.
Garrett testified that, as of November 2006, the mother still had not followed through on the recommended counseling services but had undergone the psychological assessment. The psychologist who conducted the assessment indicated that the mother should obtain individual counseling as well as joint counseling with the father to address their domestic-violence issues. Based on the results of the psychological assessment, DHR recommended that the mother attend drug rehabilitation and undergo individual and joint counseling.
Garrett testified that, in November 2006, DHR received anonymous reports that the mother, U.B., and the children's maternal uncle were staying overnight and possibly living in the father's home with the children. Garrett and a coworker made an unannounced visit to the father's house on November 16, 2006. Garrett found the mother at the father's home, and the mother admitted that she had stayed there overnight. Garrett was not able to confirm whether the mother had been left unsupervised with the children, but Garrett concluded that both the mother and the father had violated DHR's rules. Garrett testified that both parents had been informed that no one could be in the home overnight without DHR's approval; she also testified that this had been a requirement of the ISP.
Based on that incident, DHR removed the children from the father's custody and returned them to foster care. At that time, the children were placed in the home of S.A., a foster parent.
Immediately after removing the children from the father's custody, DHR scheduled an ISP meeting to arrange visitation for the mother and the father. However, neither the mother nor the father attended that ISP meeting. Both parents called to inform DHR that they could not attend. An ISP meeting was eventually held on December 12, 2006. Both parents attended *Page 274 
the ISP meeting and the mother and the father began visiting the children at that time.
According to Garrett, the mother stopped visiting the children altogether in January 2007. Garrett testified that she had spoken with the mother on February 1, 2007, but that she had not heard from her again until May 2007. According to Garrett, the mother had not provided DHR with an address or contact numbers during this time, so Garrett had been unable to contact her.
The father, however, was in contact with DHR during this time. The father visited with the children sporadically during January, February, and March 2007. Garrett spoke with the father once in March 2007, but then she did not hear from him again until April. As of April 21, 2007, the father had stopped visiting the children altogether. He did not call DHR to explain why he had stopped visiting the children. Additionally, Garrett testified that she had discovered during this time that the telephone numbers she had been given for the father had been disconnected.
The father subsequently called Garrett to report that he had been evicted from his apartment and that he had been looking for housing. The father later reported that he had located housing. However, Garrett discovered that the house actually belonged to the father's brother-in-law and that the utilities at the house had not been connected. Thus, DHR could not place the children in that home. Garrett did not know the mother's location at that time.
Garrett testified that DHR had attempted to collect child support from the mother and the father during the time the children were in foster care. DHR had not had a valid address for the mother, and, thus, she had never been served with the child-support order. The mother had never paid support for the children. The father had been served, but he had not paid any child support. To Garrett's knowledge, the only support the parents had offered for the children had been in the form of gifts they had provided for the children at Christmas in 2006.
Garrett testified that, when she had worked with the family, the mother and the father had identified family members who could serve as potential resources for the children. The mother had identified L.P., an aunt from Union Springs. The mother had not provided an address for L.P., so Garrett had asked the mother to have L.P. get in touch with Garrett. Someone who identified themselves as L.P. had contacted Garrett and had provided Garrett with a home address. Garrett had mailed a home-study packet to the address she had been given, but the packet was never returned.
The mother had also identified her mother, U.B., as a potential resource. Garrett met with U.B. in August 2006 and concluded that she could not place the children with her. Garrett learned that U.B. had extensive health issues, including ovarian cancer, thyroid cancer, larynx disease, and Type II diabetes. As recently as September 2006, U.B. had been hospitalized. U.B. also had an extensive criminal history, including prior convictions related to drugs and recent charges for possession of stolen documents, possession of a forged instrument, and fraud. U.B. also had no means of transportation.
The father had identified as potential resources an aunt from Birmingham and a sister from Georgia. The father's aunt had initially expressed interest, but she then withdrew her name from consideration. The father's sister had stated that she could not afford the day-care expense the children would require but had agreed to contact DHR if her financial situation *Page 275 
changed. She did not contact DHR again. Finally, the children's paternal grandfather had been identified as a potential resource, but, according to Garrett, he had indicated that he would be on the road and would not be available to supervise the children.
At the time of the termination hearing, J.A. was seven years old and A.A. was four years old. Garrett testified that the juvenile court had previously determined the children to be dependent. She testified that they had been in foster care for 15 of the previous 22 months, that both children were adoptable, and that DHR had located an appropriate placement for both children together. She stated that she had explained to the mother and the father in May 2007 that DHR was pursuing termination of their parental rights because no progress had been made. According to Garrett, things started going downhill at that point and both parents stopped contacting DHR for months at a time.
Garrett testified, without objection, that the father had reported to her shortly before the termination hearing that he had been arrested for his alleged involvement in a robbery and that he had spent time in jail.
Garrett testified that the mother had never really complied with DHR's requirements. She was given housing applications, but she had never completed them or, if she had, she had never turned them in. She did not attend her counseling. The mother had been referred to Covenant Services and to Dr. Atchison for counseling, but she had attended only one counseling session. Additionally, the father had been referred to Katina Houston in Birmingham for counseling, and the mother had indicated that she would contact her as well. However, the mother never did. The mother had not stayed in contact with DHR. She had not maintained contact with her children or maintained regular visitation with them. She had no place to live, she had not maintained stable employment, and she had no transportation.
Additionally, the mother had not kept DHR informed as to her address or telephone number; that continued for at least two months or more at a time. Garrett believed that the mother had participated in four programs while the children were in DHR's care. To Garrett's knowledge, the mother had not completed any of those programs. Garrett did not believe that the mother would show any improvement with additional time, and she believed that termination of parental rights was the only appropriate alternative.
On cross-examination by the father's attorney, Garrett acknowledged that the children had been removed from the father's custody because he had allowed the mother to stay overnight in his home. Garrett admitted that she had seen no evidence indicating that the incident had actually caused harm to the children, but Garrett testified that DHR had also been concerned about the father's financial support of the children and his use of the "SSI" payments that J.A. received. Garrett testified that she had also discovered that, on other occasions, U.B. had stayed in the father's home with the children. Garrett also testified that the father had failed to follow through with his domestic-violence counseling with Katina Houston.
Katina Houston, a counselor with Serenity Counseling Services, testified that she had been authorized to counsel both the mother and the father in this case but that she had had contact only with the father for domestic-violence issues. The father had attended only one session in March 2007 for a domestic-violence assessment. During that assessment, the father had indicated that domestic violence was an issue and that, in his mind, the mother was *Page 276 
the aggressor. The father scheduled a follow-up appointment, but he did not show up for that appointment. The father did not contact Houston again.
Houston was based in Anniston, but she had indicated to the father that she was willing to provide counseling to the father in Birmingham. Houston testified that she or someone else in her office had been supervising the weekly visitation between the parents and the children and that she had offered to provide the parents' counseling to them each week before the visitation so that the parents would not have to make another trip to Anniston. The mother had never contacted Houston's office regarding her domestic-violence assessment.
Houston testified that, in 2006, before the children had been returned to the father, she had supervised the visits between the father and the children. Houston reported that those visits had gone well. Houston testified that, a few months after the children had been returned to foster care, the father had simply stopped visiting altogether. Her office had had no contact from him to explain why he had stopped visiting.
On cross-examination, Houston acknowledged that in March 2007 both the mother and the father had attended a visitation with the children. She stated that that visit had gone well and that the children had been very happy to see the parents. She also testified that the children had interacted more with the father than with the mother and that she believed that had been because the children were used to seeing the father at visitation. Houston acknowledged that the mother had exhibited a kind and loving approach to the children at the visitation.
On cross-examination, Houston explained that the mother's last visit might have occurred in January 2007; Houston was not certain of the date. However, Houston had supervised only one visit between the children and the mother. Houston acknowledged that the mother had had all the necessary contact numbers to arrange for visitation but that the mother had not contacted her to arrange visitation.
S.A., the foster mother, testified that the children had been placed in her custody in November 2006. According to S.A., since the children had been in her custody, the mother had never called S.A.'s home, had never corresponded with S.A., and had never sent the children a Christmas or birthday gift. The mother and the father had, however, sent some clothes with the children when they were first placed in S.A.'s care. S.A. testified that the father had not visited the children at S.A.'s home, but, she said, he used to call the children once a week. S.A. had told the father that he could call the children any time. The last time he had called the children was on Father's Day 2007. During that conversation, he had told S.A. he would visit with the children on the following Saturday, but he did not show up for the visit. S.A. testified that there had been a few other instances when the father was supposed to visit with the children but had failed to show up. Neither the mother nor the father had left telephone numbers with S.A. S.A. testified that U.B. had called the children sporadically and that the children had been happy to hear from her.
S.A. testified without objection that the children had made comments to her regarding fights that had occurred between the parents. According to S.A., the children had stated, "my mom would fight my dad all the time," "my mom and my dad would choke each other," and "my mom tried to cut my dad." *Page 277 
The mother testified at the termination hearing. She acknowledged that she had not located housing, had not attended counseling, had not completed any of the four or more programs that she had attended, had not maintained regular visits and contact with the children, had not kept DHR informed as to her location and contact numbers, and had not maintained stable employment. She offered explanations for those problems, but she agreed that her behavior and actions had not been acceptable.
The mother called the children's maternal grandmother, U.B., as a witness. U.B. had indicated to Garrett her interest in serving as a relative resource for the children, but she did not file a formal petition to intervene in the action. At the time of the termination hearing, U.B. was living in an one-bedroom apartment. She testified that if she was awarded custody of the children, she would obtain a larger apartment. Garrett had requested a letter from U.B.'s physician attesting that U.B. was in good health; U.B. had complied with that request the morning of the hearing. U.B. testified that her only income was a monthly widow's pension from the Veteran's Administration. U.B. testified that she does not have transportation; instead, she relies on public transportation.
U.B. had no knowledge that the mother had ever stayed with the father while the children had been in foster care. U.B. had been worried about the mother's being homeless over the last year and had worried that the mother had not been stable. U.B. stated, however, that the mother had been doing things to get back on track. She had never witnessed the mother and the father engage in physical acts of domestic violence.
On cross-examination, U.B. acknowledged a 1999 conviction for possession of a forged instrument; she also admitted that she had another conviction for possession of a forged instrument in another year, but she would not identify the date of that conviction. She had completed her supervised probation resulting from those convictions in 2005. U.B. also testified that she had entered an "extensive drug rehabilitation" program in 2004. She also acknowledged that she suffers from asthma, high blood pressure, and Type II diabetes and that she had had surgery for larynx disease, ovarian cancer, and thyroid cancer in the past. However, her physician had approved her as physically capable of caring for the children.
On November 13, 2007, the juvenile court entered a judgment terminating the mother's and the father's parental rights to J.A. and A.A. The father filed a motion to alter, amend, or vacate the judgment; that motion was denied on November 28, 2007. The mother appealed on November 26, 2007 (case no. 2070173); the father appealed on December 12, 2007 (case no. 2070226).
 Analysis
In case no. 2070173, the mother asserts only that the juvenile court failed to consider placing the children in the custody of U.B. as a viable alternative to termination. In case no. 2070226, the father asserts that the juvenile court erred in terminating his parental rights and that the juvenile court erred by not considering placement of the children with U.B. as a viable alternative to termination. We first address the father's argument that his parental rights were wrongfully terminated.
Under Alabama law, a juvenile court may terminate a parent's rights to a child if the State proves by clear and convincing evidence that grounds for termination exist. See
§ 26-18-7, Ala. Code 1975; and Ex parte Beasley,564 So.2d 950, 952 (Ala. 1990). "Clear and convincing *Page 278 
evidence" is "`[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.'" L.M. v. D.D.F., 840 So.2d 171, 179
(Ala.Civ.App. 2002) (quoting § 6-11-20(b)(4), Ala. Code 1975).
Section 26-18-7(a), Ala. Code 1975, a part of the 1984 Child Protection Act, § 26-18-1 et seq., Ala. Code 1975, specifies grounds for terminating parental rights. Section 26-18-7
provides, in part:
 "(a) If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child, the juvenile court shall consider, . . . but not be limited to, the following:
 "(1) That the parents have abandoned the child, provided that in such cases, proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parents.
 ". . . .
 "(6) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.
 ". . . .
 "(b) Where a child is not in the physical custody of its parent or parents appointed by the court, the court, in addition to the foregoing, shall also consider, but is not limited to the following:
 "(1) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of its support, where the parent is able to do so.
 "(2) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the department, or any public or licensed private child care agency, and agreed to by the parent.
 "(3) Failure by the parents to maintain consistent contact or communication with the child.
 "(4) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review."
The father argues that the children were removed from his custody in November 2006 for the sole reason that the mother had spent the night in his home, which was in violation of DHR's rules. The father argues that this was an insufficient reason for DHR to remove the children. He also argues that this transgression had served as a barrier to the father's being considered for reunification and had ultimately led to termination of the father's parental rights.
We do not decide whether the November 2006 incident, standing alone, would have been sufficient grounds to support termination of the father's parental rights, because we conclude that the juvenile court heard ample other evidence on which it could have based its judgment terminating the father's parental rights. *Page 279 
For example, in 2006, DHR identified domestic violence as an issue for the father to address; as of the time of the termination hearing, the father had attended only one counseling session aimed at that issue. Thus, the father failed to adequately address the issue of domestic violence, although he had agreed to do so.
Additionally, although the father had substantially cooperated with DHR for the majority of 2006, once the children were returned to foster care the father had failed to maintain regular contact and visitation with them. According to Katina Houston, the father's visitation with the children was sporadic from January 2007 through March 2007, and his last visitation with the children had occurred in April 2007. DHR did not file the termination petitions until two months later.
Further, according to the foster mother, the father's last telephone contact with the children had occurred in June 2007 and the father had scheduled a visit with the children during that telephone conversation for the following Saturday. The father, however, did not show up for that visit and did not call to inform the foster mother or the children that he would not be attending. The foster mother could not contact the father because he had not provided any contact numbers to her. Additionally, the hearing on the termination petitions was not conducted until October 2007. From June 2007 through October 2007, the father never contacted the children.
The father also failed to pay child support for his children while they were in foster care, even though he had been served with a child-support order. According to the foster mother, the father had also failed to provide gifts for the children for Christmas or for birthdays.
Additionally, during early 2007 the father was evicted from his home; thus, he no longer had safe and stable housing available for the children. Although the father had subsequently reported that he had located new housing, DHR discovered that that home was not in the father's name and that the utilities had not been connected. Thus, the father had no home in which the children could be placed. Additionally, DHR had learned that the father had been arrested and jailed in 2007 for his alleged involvement in a robbery.
Significantly, the record establishes that the father failed to appear at the termination hearing. The only justification provided for the father's failure to appear was that he lacked transportation from Birmingham to Anniston on the date of the hearing. DHR's removal of the children from the father's care in November 2006 had absolutely no bearing on the events that followed: the father's failure to maintain regular visitation and contact with the children, his eviction from his apartment, his arrest, and his failure to appear at the termination hearing. The juvenile court's decision to terminate the father's parental rights could have been based on these acts or conditions rather than on the father's allowing the mother to stay overnight in his home in November 2006.
Thus, clear and convincing evidence was presented at the termination hearing to establish that the father was unable or unwilling to discharge his responsibilities to and for his children.
We next address the father's and the mother's arguments that the juvenile court failed to consider placing the children in the custody of U.B. as a viable alternative to termination of their parental rights. In its November 13, 2007, order, the juvenile court indicated that no viable alternatives to termination existed; the judgment did not specifically reject placing custody with U.B. as a viable alternative. *Page 280 
 "The determination of whether a viable alternative to termination of parental rights exists is a question of fact to be decided by the juvenile court. See Ex parte J.R., 896 So.2d 416 (Ala. 2004). On appeal from ore tenus proceedings in a termination-of-parental-rights case, this court presumes that the juvenile court's factual findings regarding viable alternatives are correct. See J.C. v. State Dep't of Human Res., 986 So.2d 1172, 1183 (Ala.Civ.App. 2007). However, because of the serious nature of a judgment severing a familial relationship, see L.M. v. D.D.F., 840 So.2d 171, 179 (Ala.Civ.App. 2002), this court conducts a `careful search of the record' to determine whether such findings are supported by clear and convincing evidence. In re Moore, 470 So.2d 1269, 1270
(Ala.Civ.App. 1985). See also Columbus v. State Dep't of Human Res., 523 So.2d 419, 421
(Ala.Civ.App. 1987); and Santosky v. Kramer, 455 U.S. 745 (1982)."
J.B. v. Cleburne County Dep't of Human Res.,991 So.2d 273, 282 (Ala.Civ.App. 2008).
Before terminating parental rights, a juvenile court must consider and reject all potential viable alternatives. SeeEx parte T.V., 971 So.2d 1 (Ala. 2007); Ex parteBeasley, 564 So.2d 950, 954 (Ala. 1990); A.D.B.H. v.Houston County Dep't of Human Res., [Ms. 2060699, March 21, 2008] ___ So.2d ___, ___ (Ala.Civ.App. 2008); and B.M.v. State, 895 So.2d 319, 331 (Ala.Civ.App. 2004).
We conclude that the evidence presented in this case sufficiently supported the juvenile court's determination that placing custody with U.B. was not a viable alternative to termination of the mother's and the father's parental rights. DHR investigated U.B. and discovered that she had a recent criminal record, a drug-addiction history, significant health issues, a limited income, and no means of transportation. U.B. had only recently completed probation and a drug-rehabilitation program. That U.B. would not relapse into drug addiction had not been sufficiently established.
In assessing the fitness and qualification of a relative to assume custody of dependent children, the juvenile court is required to consider all the evidence relating to the relative's ability to serve the best interests of the children.See J.B., supra (citing Ex parte J.R.,896 So.2d 416, 428 (Ala. 2004)). We conclude that the evidence, when considered as a whole, supported the juvenile court's determination that placing the children with U.B. was not an appropriate placement option for the children. For these reasons, we affirm the juvenile court's judgment.
AFFIRMED.
THOMPSON, P.J., and PITTMAN and BRYAN, JJ., concur.
THOMAS, J., concurs in the result, without writing.
[1] On appeal, the mother argues only that the juvenile court failed to properly consider placing the children in the custody of U.B., their maternal grandmother, as a viable alternative to termination of the mother's parental rights. For this reason, we pretermit a discussion of many of the facts relevant to the mother's circumstances and DHR's efforts to rehabilitate her.
[2] DHR remained concerned about domestic-violence issues and continued to recommend domestic-violence counseling for both parents.