MOORE, Judge.
T.S. (“the mother”) appeals from a judgment of the Marion Juvenile Court (“the juvenile court”) terminating her parental rights to J.B. (“the child”). We affirm.

Facts and Procedural History

The child was born to the mother and R.B. (“the father”) on April 12, 2006, in Massachusetts. M.O., the child’s paternal uncle, testified that, sometime in 2006, the father contacted him and told him that he had a new baby, that the mother was in “a rehab,” and that he wanted to straighten out his life. M.O. testified that he then traveled to Massachusetts and picked up the father, the mother, and the child and brought them to Alabama to live with him and his wife, T.O. The mother testified that, when M.O. picked them up in Massachusetts, she was actually residing at a family shelter with the child and that she had been sober for one year at that time. M.O. testified that the father, the mother, and the child lived with him and T.O. for about six months, at which time they moved into M.O.’s second home. M.O. testified that things went well at first but that he eventually suspected that the parents were doing drugs because they requested that he give them money instead of purchasing milk for the child, money and other things came up missing, and he observed known “cookers” hanging around the parents’ home. He testified that he had never seen the mother using drugs but that he had witnessed her “high.” He testified that he moved to Missouri in late 2007 or early 2008. His wife, however, did not join him in Missouri until after February 2008.
The Walker County Department of Human Resources (“the Walker County DHR”) became involved with the family in February 2008. The mother testified that she was involved in an automobile accident *271 and left the scene of the accident. She testified that she was sober at the time of the accident but that the people who were with her, the father and another individual, were not. Walker County DHR records indicate that the child was bleeding from his mouth as a result of the accident. The mother testified that, after the accident, she took the child to T.O., who is a registered nurse, to have her check the child. She testified that she then went home and drank two beers because she knew that she would be in trouble for having left the scene of the accident. The mother testified that, as a result of the accident, she had been charged with reckless endangerment, unlawful possession of alcohol, and resisting arrest and that those charges were still pending at the time of the trial.[1] According to a September 8, 2010, home-study report (“the home-study report”) prepared by the Marion County Department of Human Resources (“the Marion County DHR”), after the automobile accident, the police went to the parents’ home, and, when they searched the home, they found “crack,” methamphetamine pipes, and copper wiring. The mother testified that she did not know that those items were in the home. Walker County DHR records also indicate that the police found the home to be very dirty. Walker County DHR records indicate that, on February 9, 2008, the Walker County DHR received a report regarding the automobile accident and the condition of the parents’ home as found by the police. The Walker County DHR took custody of the child and placed the child in foster care. M.O. testified that, when the child was first placed in foster care, he and T.O. had wanted the child to live with them, but representatives of the Walker County DHR had stated that they were going to work with the mother to try to reunite her with the child.
The mother testified that the trauma of losing custody of the child caused her to “relapse,” but, she testified, she immediately sought help.[2] The mother began a six-month drug-rehabilitation program in August 2008. After a month, she was transferred to the program’s sister agency, Life House, so that she would be closer to the child for visitation. The mother completed the rehabilitation program in February 2009. The home-study report indicated that the mother also had completed parenting classes and counseling. From February 2008 until April 2009, the mother had supervised visitation at the Walker County DHR office for two hours each week. Beginning in April 2009, the mother was allowed Saturday visitation with the child from 9 a.m. to 6 p.m. The mother was reunited with the child in June 2009. The mother testified that she and the child lived in a halfway house until she found an apartment. She testified that she enrolled the child in “Happy Faces” day care and that he had done great. The Walker County DHR monitored the case until December 2009.
Ali Tyra, a social-service worker for the Marion County DHR, testified that, on January 28, 2010, the Marion County DHR received an anonymous telephone call indicating that the parents were using drugs *272 at the Family Inn, a hotel in Marion County, in the presence of the child. According to Tyra, the Marion County DHR investigated the matter. The mother subsequently tested positive for cocaine, although she denied having used cocaine. The mother testified that the father had been putting cocaine in his drink and that she must have drank some of his drink by mistake. She testified that she had been “clean” for two years before that positive drug screen. Tyra testified that the father tested positive for cocaine, opiates, and marijuana and that he admitted to having smoked marijuana a few days before he was tested; he also admitted to having taken a Lortab.
Tyra testified that the Marion County DHR requested a pickup order from the juvenile court. She testified that the Marion County DHR was subsequently awarded temporary custody of the child and that the child was placed in foster care. Tyra testified that the juvenile court held a permanency hearing on April 6, 2010, and that M.O. and T.O. were awarded temporary custody of the child following that hearing. Tyra testified that the Marion County DHR closed its file at that time. She also testified that the mother was living in a drug-treatment facility at that time and that she had not had any contact with the mother since then. She testified that, because the mother had had her parental rights terminated with regard to her other children, the Marion County DHR was not required to make reasonable efforts to reunite the mother and the child.
The mother testified that she was in foster care most of her childhood because her mother and stepfather were alcoholics and drug addicts. The home-study report indicates that the mother began a relationship with the father when she was 18 or 19 years old. The mother testified that she began using drugs when she was 22 years old. According to a mental-health evaluation dated March 20, 2008, the mother and the father had had their parental rights to four other children terminated because they were homeless and had substance-abuse issues. The mother testified that she voluntarily gave up her rights to two of the four children.
The mother testified that she had changed and had learned from her mistakes. She testified that, since January 2010, she had completed “treatment,” a mental-health class, and parenting classes. The home-study report indicated that she had returned to Life House for drug treatment. Maya Duffy, a substance-abuse counselor at Northwest Alabama Mental Health, testified that the mother completed the outpatient program offered at Northwest and that the mother was still attending group sessions twice a week at the time of the trial. Duffy testified that the mother had tested negative for drugs throughout her treatment, that she had shown responsibility in treatment, that she had shown support to other members, and that she had been active in treatment and had done well. The mother testified that she continues to take drug tests; she introduced into evidence several negative drug-test results. The mother testified that she also attends Alcoholics Anonymous (“AA”) meetings and Narcotics Anonymous (“NA”) meetings. The mother testified that, after completing an eight-week parenting course, she continued to attend the parenting classes for an additional five months because she felt like she needed to learn more.
The mother testified that she still lives in the same apartment that she was living in when the child was removed from her custody in January 2010. She testified that the apartment has two bedrooms and that the child’s bed and all of his clothes and toys are in her apartment. The moth *273 er also testified that she has been employed by Taco Bell since March 16, 2010, and that she earns $7.45 an hour and works 25 to 30 hours a week. She testified that she attends church on Sundays and Wednesdays and that she teaches a children’s Sunday School class. The mother introduced into evidence several letters of support from various people, including the director of Happy Faces day care and two of her managers at Taco Bell.
The mother testified at trial that the father was living in Massachusetts, that she had not talked to him in months, and that she wanted nothing to do with him. She testified that she would not let the father back into her life. She testified that the father is a drug addict and an alcoholic and that, to her knowledge, he was still using drugs. She testified that the father does not want the child.
Tyra testified that the Marion County DHR thought that the parental rights of the parents should be terminated and that M.O. and T.O. should be awarded permanent custody. Tyra testified that she was concerned with the mother’s history, her patterns, and the reason that the Marion County DHR had had to get involved with her. The home-study report indicated that, although the mother’s home was clean, organized, and had adequate furnishings, the Marion County DHR was concerned with the mother’s ability to remain substance free because of the mother’s history of her drug-rehabilitation treatment not being successful.
M.O. testified that he and T.O. still live in Missouri. He testified that, when the child first started living with them, the child had a lot of anger issues from being bounced around from place to place. He testified that the child had put holes in the walls of their home and had been cruel to their pets. He testified that they had taken the child to a doctor who had scheduled the child to have a psychiatric evaluation. M.O. testified that the child’s anger issues have improved, that he has lots of friends, that he is bonding with people, and that he has “gotten a lot better” with the pets. M.O. testified that he believed it would be in the child’s best interest for him to stay with M.O. and T.O.
T.O. testified that she wanted the child to live with her and M.O. permanently. She testified that they had taken the child to a doctor for an evaluation and that the child is fine. She testified that the only thing she and M.O. are concerned about is the possibility that the child may be hyperactive, but, she stated, they would figure that out when the child begins school. She testified that the child had calmed down a lot over the couple of months preceding the trial. She testified that the mother had telephoned and sent text messages to M.O. but that she had not spoken with the mother.
On July 30, 2010, the mother filed in the juvenile court a motion requesting that the child be returned to her custody. On August 30, 2010, M.O. and T.O. filed an answer; they also filed a petition to terminate the parental rights of the mother and the father. On September 29, 2010, the juvenile court held a trial, and, on October 1, 2010, the juvenile court entered a judgment terminating the parental rights of the mother and the father and awarding custody of the child to M.O. and T.O.[3] • On October 14, 2010, the mother filed a motion to alter, amend, or vacate the juvenile court’s judgment; that motion was denied on October 21, 2010. On October-28, 2010, the mother filed her notice of appeal to this court.[4]

*274
Discussion

On appeal, the mother argues that the State may terminate parental rights only when the evidence establishes no other viable alternative. See Ex parte Beasley, 564 So.2d 950, 954-55 (Ala.1990). The mother maintains that one viable alternative to terminating her parental rights is providing her an opportunity to grow into her role as a mother. The mother asserts that, until that opportunity is exhausted, the juvenile court may not lawfully terminate her parental rights. More precisely, the mother contends that, in this case, the juvenile court erred in terminating her parental right because it did not first give her “a chance to mature both as a person and as a mother....” Appellant’s brief, p. 8. We disagree.
The record shows the following, without dispute. The mother had given birth to four other children before the child at issue. She lost custody of all four of those children, at least two of them through involuntary termination-of-parental-rights proceedings in Massachusetts. The mother arrived in this state with the stated good intentions of changing the drug-abusing lifestyle that had led to her past parental problems; however, she eventually relapsed into drug use. After removing the child from the care of the mother, the Walker County DHR assisted the mother with completing at least her second drug-rehabilitation program. After completing that program, the mother regained custody of the child in June 2009 only to again test positive for illegal drugs and lose custody of the child in January 2010.
The evidence shows very clearly and convincingly that the mother has had multiple opportunities to grow into her role as a parent and that she has failed to take advantage of those opportunities. In assessing the viability of alternatives other than terminating the parental rights of the mother, the juvenile court was not required to blind itself to the evidence of the mother’s past failures. See T.B. v. Lauderdale Cnty. Dep’t of Human Res., 920 So.2d 565, 570 (Ala.Civ.App.2005) (“In deciding to terminate parental rights, a trial court may consider the past history of the family as well as the evidence pertaining to current conditions.”). The juvenile court was not required to treat this case as if it presented the first opportunity for the mother to rehabilitate herself and assume the role of a proper parent. Rather, the juvenile court was free to consider that the mother had repeatedly failed to overcome the problems that prevented her from becoming a proper parent and to conclude, as it apparently did, that giving the mother an additional opportunity at reform would only prove futile, thereby needlessly delaying the permanent disposition of the custody of the child. See M.W. v. Houston Cnty. Dep’t of Human Res., 773 So.2d 484, 487 (Ala.Civ.App.2000) (“At some point, however, the child’s need for permanency and stability must overcome the parent’s good-faith but unsuccessful attempts to become a suitable parent.”).
“The determination of whether a viable alternative to termination of parental rights exists is a question of fact to be decided by the juvenile court. See Ex parte J.R., 896 So.2d 416 (Ala.2004). On appeal from ore tenus proceedings in a termination-of-parental-rights case, this court presumes that the juvenile court’s factual findings regarding viable alternatives are correct. See J.C. v. State Dep’t of Human Res., 986 So.2d 1172, 1183 (Ala.Civ.App.2007). However, because of the serious nature of a judgment severing a familial relationship, see L.M. v. D.D.F., 840 So.2d 171, 179 (Ala.Civ.App.2002), this court conducts a ‘careful search of the record’ to determine whether such findings are supported by *275 clear and convincing evidence. In re Moore, 470 So.2d 1269, 1270 (Ala.Civ.App.1985). See also Columbus v. State Dep’t of Human Res., 523 So.2d 419, 421 (Ala.Civ.App.1987); and Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).”
J.B. v. Cleburne Cnty. Dep’t of Human Res., 991 So.2d 273, 282 (Ala.Civ.App.2008). Based on our review of the record, we cannot hold that the juvenile court erred in concluding that the mother had exhausted her opportunities to mature and grow into her role as a proper parent. Clear and convincing evidence supports the juvenile court’s determination that giving the mother an additional opportunity to develop the skills and devices necessary to provide a proper home and environment for the child was not a viable alternative to termination of her parental rights. We, therefore, affirm the juvenile court’s judgment.
AFFIRMED.
THOMPSON, P.J., and PITTMAN, BRYAN, and THOMAS, JJ, concur.

. The home-study report prepared by the Marion County Department of Human Resources indicated that the mother was charged with public intoxication, reckless endangerment of a child, and unlawful possession of an alcoholic beverage.

. The mother did not indicate whether her relapse related to drugs, alcohol, or both. At one point, she testified that she had not done drugs for almost two years preceding the trial; however, at another point, she testified that she had not done drugs for two years preceding January 2010. The home-study report indicated that the mother had relapsed after having been sober for 18 months.

. That judgment implicitly denied the mother’s petition for custody.

. The father has not appealed the juvenile court's judgment.