J.B. ("the mother") and M.B. ("the father") appeal from judgments entered by the Cleburne Juvenile Court on March 23, 2007, terminating their parental rights as to C.B. and the mother's parental rights as to M.W.[1]
 The Evidence
The mother was previously married to M.M. and R.W. She had a child with R.W. named Ch.W. The mother then gave birth to M.W. on May 30, 1991, while she was legally married to, but separated from, R.W.[2] The mother testified that M.M. was the biological father of M.W.[3] M.W. was born with Down Syndrome and mental retardation. R.W.'s name was placed on M.W.'s birth certificate as the father. Until their divorce in approximately 1996, the mother and R.W. raised Ch.W. and M.W. together. In the divorce judgment, R.W. was awarded custody of Ch.W. and M.W.; however, about two years later, after paternity testing revealed that R.W. was not the biological father of M.W., the mother was awarded custody of M.W. The mother subsequently married the father and later gave birth to C.B. on February 11, 1998.
The mother testified that when C.B. was born, M.W. had been excited about the new baby and had wanted to help the mother in any way she could. As C.B. aged, however, their roles reversed. C.B. became a caretaker for M.W. because of M.W.'s disability. The mother testified that C.B. did not seem to mind caring for M.W. but that C.B. would sometimes complain about M.W. just like any normal sister would.
Beginning in 2003, the Cleburne County Department of Human Resources ("DHR") began providing assistance to the mother and the father ("the parents") for reasons unstated in the record. Pursuant to DHR policy, the parents submitted to drug testing in February 2003. The tests revealed that the parents both had a substance-abuse problem. DHR did not remove C.B. and M.W. ("the children") from the custody of the parents at that time, however.
On January 4, 2005, DHR received reports of domestic violence at the mobile home of the parents. The record is vague on the details, but it appears that the father had broken the windshield of the family's automobile. DHR also received a report that the parents had left the children alone at a neighbor's mobile home and that M.W. had wandered out of that home unattended. DHR picked up the children and placed them in foster care.
DHR immediately planned to reunite the children with the parents. DHR identified several obstacles to reunification. Primarily, DHR was concerned about the parents' drug use, but DHR also indicated that the parents needed to provide a suitable and stable home environment for the children.[4] *Page 276 
The father testified that he had regularly used marijuana since he was 17 years old and that he had occasionally used cocaine since the 1970s. He explained that he had developed an anxiety problem dating back to his stay in foster care when he was a teenager. He had been prescribed Valium and Xanax for this problem, but those medications rendered him drowsy and affected his alertness; therefore, as an alternative, he used marijuana three or four times a month to relax himself. The father testified that he had never used drugs in front of the children; he said that he waited until after they were asleep and smoked on the front porch. The father testified that he did not believe children were safe in a home in which drug use was ongoing, that he did not want the children to use drugs, and that he understood that he had to stop using drugs in order to regain custody of the children.
The mother testified that she had a drug problem. Based on the positive drug tests, it appears the mother used cocaine on a regular basis. Apparently, she had undergone drug-rehabilitation treatment some time before 2005, but the record contains no details of that treatment. The mother understood that DHR wanted her to quit using drugs before she could regain custody of the children.
In September 2005, the children were transferred to the United Methodist Children's Home for placement in therapeutic foster care. Kathleen Waelti, who was the program supervisor of the Children's Home at that time, testified that C.B. was a defiant and disobedient child who needed the special care offered by a therapeutic foster home and that M.W. needed heightened care because of her mental disability. The children were placed in separate foster homes not long thereafter. Nikki Wynn, the DHR caseworker assigned to the case since July 2005, testified that it was unusual for DHR to separate siblings but that the DHR "team" had decided it would be in the children's best interests to separate them. At some point, DHR had received reports that the children were sexually acting out together. It was determined that M.W. had originally started the sexual conduct but that C.B. had since become the initiator. According to Wynn, the children were separated mainly because of this problem.
In April 2006, DHR indicated its intent to change its permanency plan from reunification to termination of parental rights. Before that date, the parents had participated in some drug counseling sessions provided by DHR, but, according to Wynn, they had not been consistent with their efforts to stop using drugs. Within two months of that date, Kelly Mizic, a licensed professional counselor, began providing weekly in-home family and substance-abuse counseling for the parents. Mizic testified that the parents were very compliant and consistent with the counseling, attending regularly and performing all the assignments she gave them. According to Mizic, the father generally accepted responsibility for his drug behavior and wanted to stop it. The mother, on the other hand, did not take responsibility for having a drug problem. Neither parent felt they needed inpatient drug rehabilitation, and neither parent asked for assistance beyond counseling to end their drug use. Despite some sporadic progress, Mizic testified that the parents had not made any real progress toward ending their drug use. DHR placed into evidence numerous positive drug screens for both *Page 277 
parents throughout 2006. In addition, the mother admitted to Mizic that she had twice used another person's prescription medication in the fall of 2006. Mizic opined that the stress from the termination-of-parental-rights proceedings had exacerbated the stress on the parents and that the parents had coped with that stress by using drugs. Mizic testified that, even without their family problems, it would be difficult for the parents to quit using drugs altogether, especially the father.
At trial, the father testified that he and the mother had moved into a rental home that he had repaired and that the home was suitable for the children, a fact to which DHR agreed. However, he admitted that he had not stopped using marijuana; in fact, he admitted that he had smoked a marijuana "joint" only four days before the hearing.[5] He testified that he felt he was progressing towards abstinence but that he had not yet met that goal. He testified that he would not want the children to return to his home until he had stopped using drugs for at least six months and that, in the meantime, he believed it would be in the children's best interests to live with G.H., their maternal grandmother. The father stated that he had no relatives who could take the children. The father denied that he had ever said that the maternal grandmother should not care for the children. He testified that he did not believe the children's other relatives could properly care for them but that he had never felt that way about the children's grandparents. The father testified that he believed the maternal grandmother's home would be "highly" appropriate for the children and that they would be safe there.
The mother testified that she had also been unable to stop using drugs. The mother testified that she also believed it would be in the children's best interests to live with the maternal grandmother until she and the father could completely rehabilitate. At one time, the mother had been concerned about S.H., her brother, being present in the maternal grandmother's home because the mother was afraid her brother would steal M.W.'s Social Security check and use the money to buy drugs. After S.H. moved in with his boss, the mother no longer believed that he would be a problem. She testified that the maternal grandmother would provide a safe place for the children. The mother testified that it would not be in the children's best interests to be separated and that the maternal grandmother could care for both children because the maternal grandmother had cared for the mother's sister's children for years. The mother also testified that the maternal grandmother had no idea that the mother was using drugs and that the maternal grandmother would not allow the mother around the children so long as she was using drugs. The mother testified that she would listen to the maternal grandmother if the maternal grandmother told her to stay away from the children.
The maternal grandmother testified that, from the beginning, she had informed DHR that she was interested in taking custody of the children as a relative resource. Wynn, therefore, requested a home study on the maternal grandmother.
Because the maternal grandmother lived in Bowden, Georgia, the Georgia Division of Family and Children's Services ("DFCS") had to conduct a home study on the maternal grandmother through the Interstate *Page 278 
Compact for the Placement of Children ("the ICPC"). The home study was conducted by Spectrum Community Services, Inc., on December 12, 2005. At that time, and up to the date of the trial, the maternal grandmother was living in a clean, safe, and suitable two-bedroom apartment.[6] The maternal grandmother testified that she planned for the children to sleep in the second bedroom, in separate twin beds. The maternal grandmother was retired and had recently stopped sitting for elderly persons. According to the home study, which was placed into evidence, the maternal grandmother receives $847 per month in Social Security retirement benefits, along with $50 to $100 per month from S.H. The maternal grandmother has health insurance through Medicare and AARP. The maternal grandmother testified that she would expect the parents to provide child support and to supplement her income with M.W.'s Social Security disability benefits. The maternal grandmother's rent is $174 per month. She also is repaying a loan at $80 per month. Her other monthly expenses total $483. The maternal grandmother reported that she was currently diagnosed with high blood pressure and diabetes. The report also indicated that the maternal grandmother had reported "bad nerves" since having a hysterectomy 20 years earlier. She also has arthritis and spine problems; she uses several medications to address these health problems, but she does not take any medication for her nerves. The maternal grandmother denied any prior mental-health or substance-abuse treatment. A medical report indicated that the maternal grandmother was in good health and could care for the children.
The home study indicated that the maternal grandmother had grown up in Heflin, Alabama, and recalled her parents as good providers who gave her a positive upbringing. The maternal grandmother had five children of her own. The maternal grandmother stated that she had used "time out," redirection, and occasional spanking to discipline her children as well as the children when they visited. According to the report, the maternal grandmother had said that because of her bad nerves she gets upset when children act out but that the children had always responded well to her. The maternal grandmother agreed not to use corporal punishment to discipline the children. The home study indicated that the maternal grandmother wanted the mother to raise the children and that the maternal grandmother felt her health problems would make it difficult for her to manage the children permanently. The maternal grandmother would encourage visitation with the parents.
The home study noted that the maternal grandmother had several strengths and weaknesses as a potential caregiver for the children. As strengths, the maternal grandmother had known and had had regular contact with the children their whole lives. The maternal grandmother was aware of M.W.'s specialized needs and was willing to provide for those needs. The maternal grandmother had suitable space and transportation for the children. The maternal grandmother believed she could adequately provide for the children's nourishment and financial support. As for weaknesses, the maternal grandmother had health problems that the maternal grandmother felt could interfere with her ability to care for the children on a long-term basis. E.M., another of the maternal *Page 279 
grandmother's daughters, is also noted in the home study as expressing concern about the maternal grandmother's health and her ability to control C.B. and care for the children long-term. E.M. agreed to help the maternal grandmother with the children. The maternal grandmother's income was fixed and limited so that she may need additional financial support. The evaluator summed up the home study as follows:
 "[G.H.] is the maternal . . . grandmother of [C.B.] and [M.W.] She has had regular contact with [the children] throughout their lives and has the means of providing a stable environment for them. [G.H.] is retired and able to provide full time supervision. She has rented her current apartment for the past four months, but has lived in the complex for six years. [G.H.] has experience raising five of her own children. She has sufficient space in her home and transportation. However, she has limited financial resources. [G.H.] has the support of friends and family. She maintains contact with the children's mother, [J.B.] She is willing to support visits between the children and their parents; however, she expresses concern that the parents may agree to visit and not follow through.
 ". . . .
 "Given [G.H.]'s familiarity with the children and her desire to provide for care to [the children], she should be considered as a placement option for [the children] pending reunification. [G.H.] has adequate housing and transportation resources; however, she may require financial assistance to ensure she is able to meet the needs of the children. It is recommended that [G.H.] be provided support and supervision to assist her in meeting [M.W.]'s specialized needs and managing [C.B.]'s behavioral issues. . . ."
Although it appeared that the evaluator recommended the maternal grandmother as a placement option, subject to certain conditions, the home study was forwarded to DHR with a February 3, 2006, cover letter signed by Andrell Turner, the Social Services Administrator for the Georgia DFCS, which stated:
 "Enclosed please find the completed home evaluation on [G.H.] for the possible placement of her grandchildren. After careful consideration, we are unable to approve this placement due to: [G.H.]'s medical issues which include `bad nerves'; limited financial resources; and [G.H.]'s acknowledgment that she cannot care for the children long term. [G.H.]'s reference also indicated that she would not be able to provide care for any length of time. Moreover, it is questionable as to whether or not [G.H.] can meet [M.W.]'s specialized needs."
After receiving this report, Wynn informed the maternal grandmother that, based on the Georgia home study, the maternal grandmother had been denied for consideration as a possible placement for the children. Wynn testified that because Georgia had not approved the maternal grandmother, the Georgia counterpart to DHR would not assist the maternal grandmother with caring for the children. Additionally, because the maternal grandmother was out of state and had not been approved for placement by her state of residence, DHR could not provide any assistance to her. Because the maternal grandmother had been denied as a potential placement, Wynn testified that there were no viable alternatives to termination of parental rights and placing the children for adoption.
At trial, Waelti, a licensed professional counselor, testified that she had begun counseling C.B. in September 2006 on a *Page 280 
weekly or biweekly basis. By the time of the trial, C.B. had stabilized emotionally and was excelling socially and academically. C.B. enjoyed a normal child-adult relationship with her foster parents. C.B. only regressed following visits with her parents. Waelti testified that following parental visits, C.B. would express her belief that it was her and M.W.'s fault that they had been removed from their parents. C.B. also indicated that the mother would tell C.B. that the parents loved her but that DHR and the foster parents were bad. Waelti concluded that C.B.'s interactions with the parents were disruptive.
Waelti opined that C.B. needed permanency, stability, and nurturing to avoid the risk of repeating the patterns of behavior she had seen or learned. On direct examination, Waelti recommended that the parents' rights be terminated and that C.B. be adopted by the foster parents. However, on cross-examination, Waelti conceded that if C.B. had a permanent home, it would not necessarily be negative for her to continue to see her parents.
Waelti also testified that although there had been prior instances of inappropriate sexual activity between the children, since September 2006 C.B. had had a very nurturing relationship with M.W. The two visited together monthly, and M.W. had spent the night on occasion at C.B.'s foster home. Waelti testified that it would not be in the best interest of C.B. for her never to see M.W. again. Waelti felt that it would be difficult to place C.B. with M.W. because of M.W.'s special needs but that placement of both siblings together with an appropriate caregiver "would be the ideal situation." That caregiver would need specialized training and would have to implement a plan to keep C.B. separate from M.W. to protect M.W. from any sexual acting out by C.B. Waelti felt that the children had already been emotionally scarred because of the inappropriate sexual activity and that any additional episodes of sexual activity would be devastating to the children.
Sue O'Neill is a licensed professional counselor who provided counseling services for C.B. from September 25, 2005, to August 14, 2006, and for M.W. from September 25, 2005, to January 9, 2007. O'Neill had also supervised 12 visitations between December 2005 and August 2006. When O'Neill first started counseling the children, C.B. was being physically and emotionally abusive to M.W. O'Neill testified that she supported separating the children because they were excelling when they were apart from one another but were regressing and acting out sexually when they were together. O'Neill testified that if they were placed together, it would take a highly skilled person to deal with their special needs. According to O'Neill, M.W. requires around-the-clock care and supervision and C.B. is also a special-needs child because of her emotional problems and borderline gifted intellect. She testified that putting the two of them together would be extremely complicated even for someone highly trained. O'Neill testified that the children would never be able to appropriately coexist because of C.B.'s exploitative attitude toward M.W. and that she felt it would be in the best interests of the children to separate and resume their relationship after turning 18.
O'Neill testified that she did not believe the maternal grandmother could handle C.B. because C.B. had ignored the maternal grandmother's attempts to reprimand her in visitations when C.B. was acting inappropriately. O'Neill opined that even with joint counseling, C.B. would not learn to obey the maternal grandmother. O'Neill testified that a person would have to have specialized skills to the level of a therapeutic foster parent in order to care *Page 281 
for M.W. O'Neill felt the maternal grandmother was wonderful to have visited with the children consistently since they entered foster care; however, she felt the children suffered from post-traumatic stress disorder that would be triggered by continuing their relationship with any of their relatives.
The maternal grandmother testified at trial that she was aware that she had not been approved by Georgia's DFCS; however, she testified that the bases for her denial were not true or accurate. The maternal grandmother testified that, after paying her monthly bills, she had about $700 in disposable income and that she could financially care for the children. The maternal grandmother testified that she may have told the home evaluator that she could not care for the children on a long-term basis but that, in fact, she could. The maternal grandmother stated that her health problems were under control and that they would not interfere with her ability to care for the children. The maternal grandmother denied having any nervous or emotional condition. The maternal grandmother also testified that she had known M.W. all of her life, that she was well aware of M.W.'s special needs, and that, despite her lack of specialized training, she could meet those needs. The maternal grandmother testified that she was unaware of the children's sexual problems but that she would be able to look out for any inappropriate activity and correct it. The maternal grandmother admitted that she had no special training in dealing with sexually active children, but she agreed to attend any training necessary to allay DHR's concerns about her ability to care for the children. DHR had not asked her to receive any training, however. The maternal grandmother testified that she would assure that S.H. would not be around the children if the juvenile court so ordered. The maternal grandmother also stated that she would take any training necessary to enable her to detect signs of drug use so she would be sure the children were not exposed to drug use and that no drug use would be allowed in her home.
The maternal grandmother denied ever telling anyone that the plan was for her to obtain custody of the children so the parents could get M.W.'s disability check. The maternal grandmother testified that she believed the parents could one day reunite with the children if they would rehabilitate. Her goal, if she got the children, would be to return them to the parents once they rehabilitated. She testified, however, that she would agree with a court order prohibiting the parents from having the children and would abide by such an order. The maternal grandmother stated that she would not allow the mother to have custody of the children so long as she continued to use drugs.
Wynn testified at trial that the maternal grandmother had never indicated to Wynn that the maternal grandmother could not care for the children on a long-term basis. The maternal grandmother never told Wynn she had any health problems that would prevent her from caring for the children. Wynn testified that after hearing the maternal grandmother's testimony, and assuming it to be true, the maternal grandmother appeared to have the financial resources to care for the children, especially with the additional income from M.W.'s disability check. Wynn stated that the maternal grandmother had consistently visited the children and had missed visitation only once or twice for good reasons. Wynn agreed that the maternal grandmother enjoyed a very good and loving relationship with the children and that the maternal grandmother was attentive to their needs. Wynn testified that she had a possible concern that if the maternal *Page 282 
grandmother got the children, the parents would have free access to them.
 Issue
The parents appeal on the sole ground that the juvenile court erred in concluding that placing the children with the maternal grandmother was not a viable alternative to termination of their parental rights. Based on the arguments presented by the parties in their respective briefs, we consider the issue for review to be whether DHR presented clear and convincing evidence that the maternal grandmother would not be a suitable custodian for the children.
 Standard of Review
The determination of whether a viable alternative to termination of parental rights exists is a question of fact to be decided by the juvenile court. See Ex parte J.R., 896 So.2d 416
(Ala. 2004). On appeal from ore tenus proceedings in a termination-of-parental-rights case, this court presumes that the juvenile court's factual findings regarding viable alternatives are correct. See J.C. v. State Dep't of HumanRes., 986 So.2d 1172, 1183 (Ala.Civ.App. 2007). However, because of the serious nature of a judgment severing a familial relationship, see L.M. v. D.D.F., 840 So.2d 171, 179
(Ala.Civ.App. 2002), this court conducts a "careful search of the record" to determine whether such findings are supported by clear and convincing evidence. In re Moore,470 So.2d 1269, 1270 (Ala.Civ.App. 1985). See also Columbus v. StateDep't of Human Res., 523 So.2d 419, 421 (Ala.Civ.App. 1987); and Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388,71 L.Ed.2d 599 (1982). "Clear and convincing evidence" is "`[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.'" L.M. v.D.D.F., 840 So.2d at 179, citing in turn Ala. Code 1975, § 6-11-20(b)(4).
Before terminating parental rights in an action initiated by a state agency, a juvenile court must consider and reject all viable alternatives. See Ex parte Beasley,564 So.2d 950, 954 (Ala. 1990). A juvenile court is not required to make a specific written finding that viable alternatives have been considered and rejected. See generally Ex parte State Deptof Human Res., 624 So.2d 589, 593 (Ala. 1993) (holding that juvenile court is not required to make particularized written findings of fact when terminating parental rights). A finding that viable alternatives have been considered and rejected is implicit in a judgment terminating parental rights. Seegenerally M.J.G.L. v. State Dep't of Human Res.,587 So.2d 1004, 1006 (Ala.Civ.App. 1991). Thus, the mere fact that the juvenile court in this case failed to explicitly state in its judgments that it had considered placing the children with the maternal grandmother, but found that such placement was not a viable alternative, does not render the judgments erroneous. The juvenile court's judgments will only be reversed if its implied finding that placement with the maternal grandmother was not a viable alternative is unsupported by clear and convincing evidence so that its decision is "plainly and palpably wrong."See J.C., 986 So.2d at 1183.
 Analysis
Alabama Code 1975, § 12-15-71(a)(3)c, provides that a juvenile court may transfer legal custody of a dependent child to "[a] relative . . . who, after study by the Department of Human Resources, is found by the court to be qualified to receive and care for the child." In addition, *Page 283 
in Ala. Code 1975, § 12-15-62(c), the legislature explicitly recognized that a juvenile court may place a dependent child with "a fit and willing relative." Pursuant to these statutes, DHR "`has the burden of initiating investigations regarding [potential relative resources], and it is DHR's burden to prove the unsuitability of one who seeks to be considered as the custodian of a dependent child.'" Ex parte J.R.,896 So.2d at 428 (quoting D.S.S. v. Clay County Dep't of HumanRes., 755 So.2d 584, 591 (Ala.Civ.App. 1999)).
DHR has not promulgated any regulations that set out the criteria for determining whether a relative is "fit" or "qualified to receive and care for a child." See K.N.F.G. v.Lee County Dep't of Human Res., 983 So.2d 1108, 1120 n. 9 (Ala.Civ.App. 2007) (Moore, J., dissenting). This court has never endeavored to define those terms, either. However, the context in which those terms are used suggests their meaning.See Chism v. Jefferson County, 954 So.2d 1058, 1074
(Ala. 2006) (recognizing that in construing isolated terms in a statute, the court should refer to the context in which those terms are used). Alabama Code 1975, § 26-18-7(a), provides that a juvenile court may terminate parental rights
 "[i]f the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future. . . ."
The "responsibilities" to which the statute refers is the duty of the parent to provide for the physical, financial, mental, and other needs of the child. See, e.g., T.M.S. v. ElmoreCounty Dep't of Human Res., 647 So.2d 746, 747
(Ala.Civ.App. 1994). Thus, in the context of an alternative to termination of parental rights, a relative is "fit" and "qualified" if that relative can safely and properly discharge the parental responsibilities of meeting the child's needs during the child's minority. Conversely, a relative is not "fit" or "qualified" if that relative cannot safely and properly discharge parental responsibilities to and for the child or cannot properly care for the child because of the relative's improper conduct, adverse condition, or inappropriate circumstances.
The parents initially argue that clear and convincing evidence does not support the reasons why the maternal grandmother was denied as a potential relative placement by the Georgia DFCS. The parents assert that the evidence at trial proved that the maternal grandmother had the physical and financial ability to care for the children on a long-term basis, despite the findings of the Georgia DFCS to the contrary. Although the maternal grandmother's testimony contradicts the Georgia DFCS report to some degree, the maternal grandmother admitted that she "might have" informed the Georgia DFCS home evaluator that she suffered from "bad nerves" that would cause her to get upset when children misbehaved and that she had concerns that she could not care for the children on a long-term basis. When faced with these inconsistent statements, the juvenile court could have reasonably concluded that the maternal grandmother's in-court testimony regarding her health and long-term-care potential was not credible. "`The trial court, as the finder of fact, is required to resolve conflicts in the evidence.'" DM. v.Walker County Dep't of Human Res., 919 So.2d 1197, 1214
(Ala.Civ.App. 2005) (quoting Ethridge v. Wright,688 So.2d 818, 820 (Ala.Civ.App. 1996)). "`"In ore tenus proceedings, *Page 284 
the trial court is the sole judge of the facts and of the credibility of the witnesses, and it should accept only that testimony which it considers worthy of belief." demons v.demons, 627 So.2d 431, 434 (Ala.Civ.App. 1993).'" W.P.v. Madison County Dep't of Human Res., 980 So.2d 1016, 1021
(Ala.Civ.App. 2007) (quoting Ex parte R.E.C.,899 So.2d 272, 279 (Ala. 2004)).
More to the point, the juvenile court was not bound to approve placement with the maternal grandmother even if the evidence proved the inaccuracy of the Georgia DFCS findings. In assessing the fitness and qualification of a relative to assume custody of dependent children, the juvenile court is required to consider all the evidence relating to the relative's ability to serve the best interests of the child. See Ex parte J.R., supra.
The testimony from DHR's counselors indicated that the children have specialized needs that the maternal grandmother could not meet without expert training. The parents do not argue that DHR has the duty to provide such training. The relevant statutes speak of "fit" and "qualified" relatives, indicating that the relative must already possess those qualities necessary to properly care for the children, not that they potentially could be trained to obtain those qualities.
In addition, O'Neill testified that, based on her personal observations of the interaction between the maternal grandmother and C.B., she did not believe C.B. would obey the maternal grandmother even with joint counseling. O'Neill further testified that placement of the children with any
relative would be detrimental to their emotional and mental health because of their post-traumatic stress disorders. The parents did not offer any expert testimony or other evidence to contradict those opinions. Hence, the juvenile court could have reasonably concluded that placement with the maternal grandmother could actually harm the children and undo the progress that they had made.
The parents last argue that it is not in the best interests of the children to be separated and that placement with the maternal grandmother is the only way to assure that they will maintain their relationship. The evidence in the record demonstrates that the relationship between the children is sometimes disrupted by inappropriate sexual activity. Although the children have a strong bond, any additional sexual acting out will have a devastating emotional impact on them. Accordingly, Waelti testified that the children should only be placed together in a home with an adult specially trained to deal with sexually active children. O'Neill testified that placing the children together would be detrimental to both of them. The maternal grandmother is not trained to identify the signs of such inappropriate activity or to implement an appropriate plan to prevent it. The maternal grandmother testified at trial that she planned for the children to sleep together in the same bedroom, although in separate beds. The maternal grandmother testified that she would be on the alert for any signs of improper sexual activity and that she would take steps to stop it, but she did not elaborate further. Based on the totality of the evidence, the juvenile court could have reasonably determined that placement with the maternal grandmother would not serve the best interests of the children.
Because clear and convincing evidence indicates that the maternal grandmother could not properly provide for the needs of the children, the juvenile court did not err in failing to find that the maternal grandmother was a "fit" and "qualified" relative to receive and care for the children. Because the parents do not point out any *Page 285 
other viable alternative, the judgments terminating their parental rights are due to be affirmed.
2060709 — AFFIRMED.
2060710 — AFFIRMED.
THOMPSON, P.J., and BRYAN, J., concur.
PITTMAN and THOMAS, JJ, concur in the result, without writings.
[1] On May 3, 2007, the mother appealed the termination of her parental rights as to M.W.; that appeal was assigned case number 2060709. That same date, both parents appealed the termination of their parental rights as to C.B.; that appeal was assigned case number 2060710. By order dated May 15, 2007, this court consolidated the appeals.
[2] The Cleburne Juvenile Court terminated R.W.'s parental rights as to M.W.; he has not appealed.
[3] M.M.'s parental rights as to M.W. were not at issue in the proceedings below and are not at issue on this appeal.
[4] DHR also investigated reports of alleged sexual abuse against the children, but it found those reports to be "not indicated." In addition, in August 2005, the mother reported that the father had broken her glasses when they argued in DHR's lobby following his refusal to submit to a drug screen. The mother went to a domestic-violence shelter for three days, but she did not complete the program. The record indicates that there have been no further domestic-violence incidents between the parents since that time.
[5] The father also tested positive for methamphetamine on the date of the hearing. The father adamantly denied ever using methamphetamine, but he testified that he had heard that some people were lacing marijuana with the drug.
[6] The only deficiency mentioned in the home study was the fact that the maternal grandmother kept household cleaners and medications in places where the children could access them. The maternal grandmother was advised to correct this problem.