998 So.2d 475 (2008)
B.H.
v.
MARION COUNTY DEPARTMENT OF HUMAN RESOURCES.
2070055.
Court of Civil Appeals of Alabama.
June 13, 2008.
*476 Tim R. Wadsworth, Sulligent, for appellant.
Troy King, atty. gen., and Sharon E. Ficquette and Elizabeth L. Hendrix, asst. attys. gen., for appellee Department of Human Resources.
THOMAS, Judge.
In January 2007, the Marion County Department of Human Resources ("the Marion County DHR") petitioned for and received custody of C.N.H. ("the child") after his birth to N.H. ("the mother"). B.H., the mother's great-aunt ("the maternal great-aunt"), contacted the Marion County DHR within two weeks of the child's birth to request to be considered by the Marion County DHR as a relative resource for the child. The Marion County DHR declined to initiate any investigation of the maternal great-aunt as a potential relative resource, so she petitioned to intervene in the pending dependency case. She also filed a petition for custody of the child; that case was assigned case number JU-07-13.03.
After being ordered to do so by the trial court, the Marion County DHR completed a home study on the maternal great-aunt's home. The study indicated the house itself to be suitable and indicated that the maternal great-aunt and her husband T.T.H. had both been appropriate parents to their now grown children. However, the home-study evaluator expressed concern over a potential placement with the maternal great-aunt because, at the time of the home study, the mother lived next door to the maternal great-aunt and because the maternal great-aunt suffered from back problems that required her to take the narcotic pain reliever Lortab on a daily basis, which, according to the home-study report, raised issues about who would care for the child if the maternal great-aunt took three Lortab in one day, as she had reported doing on occasion. In addition, the home-study report reflected that the maternal great-aunt was on medications for emphysema and chronic obstructive pulmonary disease, depression, high blood pressure, irritable bowel syndrome, psoriasis, and gastroesophageal reflux disease. Based on the concerns about the possibility of future contact with the mother and the maternal great-aunt's ability *477 to care for the child when taking several doses of a narcotic pain reliever, the home-study evaluators did not approve placement of the child in the maternal great-aunt's home.
After securing a finding from the juvenile court that reasonable efforts to rehabilitate the mother were not required, the Marion County DHR petitioned to terminate the mother's parental rights; that case was assigned the case number JU-07-13.04. The juvenile court took evidence on both the Marion County DHR's termination petition (JU-07-13.04) and the maternal great-aunt's custody petition (JU-07-13.03) on September 28, 2007.[1] After the conclusion of the trial, the juvenile court terminated the mother's parental rights[2] and denied the maternal great-aunt's custody petition. Only the maternal great-aunt appealed from the judgments in both the custody case (JU-07-13.03) and the termination case (JU-07-13.04).
We will first address the maternal great-aunt's appeal insofar as it attempts to attack the judgment terminating the mother's parental rights in case number JU-07-13.04. See D.M. v. Walker County Dep't of Human Res., 919 So.2d 1197, 1205-06 (Ala.Civ.App.2005) (holding that an aunt seeking custody of a dependent child could not assert the rights of the parents, whose rights were terminated, on appeal from the denial of her custody petition); see also State v. Property at 2018 Rainbow Dr., 740 So.2d 1025, 1027 (Ala.1999) (indicating that standing is a jurisdictional prerequisite). "Standing ... turns on `whether the party has been injured in fact and whether the injury is to a legally protected right.'" Property at 2018 Rainbow Dr., 740 So.2d at 1027 (quoting Romer v. Board of County Comm'rs of the County of Pueblo, 956 P.2d 566, 581 (Colo.1998) (Kourlis, J., dissenting)). The maternal great-aunt lacks standing to appeal from the termination judgment because that judgment did not result in an injury in fact to any of the maternal great-aunt's legally protected rights. Only the mother's rights were impacted by the termination judgment, and only she could make the arguments asserted by the maternal great-aunt regarding the termination judgmenti.e., whether the appropriate quantum of evidence established the child's dependency and whether the juvenile court erred by determining that there existed no viable alternatives to the termination of the mother's parental rights. D.M., 919 So.2d at 1206. We therefore dismiss the maternal great-aunt's appeal from the termination judgment, and we will not address her arguments *478 regarding that judgment in this opinion. Id.
The maternal great-aunt does, however, have standing to appeal the denial of her petition for custody in case number JU-07-13.03. Her argument is premised on the purposes of the Juvenile Justice Act, which include "[t]o preserve and strength the child's family whenever possible," Ala.Code 1975, § 12-15-1.1(1), and the requirement that the goals of the act be achieved "with a preference at all times for the preservation of the family...." § 12-15-1.1(8). The maternal great-aunt argues, based on these stated legislative purposes, that the juvenile court should have granted her petition for custody because of her biological relation to the child. She relies on Ex parte W.T.M., 851 So.2d 55 (Ala.Civ.App.2002) (plurality opinion), as further authority for her argument that her biological relationship to the child should result in a reversal of the juvenile court's judgment denying her custody petition.
The maternal great-aunt is 47 years old. She suffers from emphysema but admittedly smokes on occasion. In addition, the maternal great-aunt testified that she suffers from migraine headaches, for which she takes Tylenol, a nonprescription pain reliever; although she did state that she had gone to the emergency room for treatment of a migraine on at least one occasion, she did not explain how often she had to seek emergency treatment for her headaches. The maternal great-aunt also suffers from high blood pressure, psoriasis, and is on hormone-replacement therapy. As noted above, the maternal great-aunt takes numerous medications. She takes the narcotic pain reliever Lortab on a daily basis for a back problem; she receives Social Security disability benefits because of her back pain and is not able to perform even sedentary work. She also admitted that she was on a prescription antidepressant medication because she became depressed in 1996, after the death of her father. According to her testimony, the maternal great-aunt had suffered increased depression since the death of her sister (the mother's mother) only a few months before the termination trial and was in the process of having her dosage of antidepressant medication increased.
Despite her health issues, the maternal great-aunt testified that she was able to care for young children like her three-year-old grandchild and a neighbor's toddler. The neighbor, J.H., testified that the maternal great-aunt had assisted her with child care on a regular basis for approximately one year; J.H.'s child was almost one year old when the maternal great-aunt began keeping him. J.H. testified that the maternal great-aunt had been a good caregiver.
Both of the maternal great-aunt's adult children, A.O. and K.H., testified that the maternal great-aunt had assisted them in caring for their children at times and that she was a very good caregiver. A.O. testified that the maternal great-aunt had assisted her regularly with her children and that the maternal great-aunt had always had the children fed, bathed, and dressed when she came to collect them. A.O. said that the maternal great-aunt's health issues never interfered with her ability to provide quality care for the children.
The maternal great-aunt's husband, T.T.H., also testified that her health issues did not interfere with her ability to rear children. In fact, he commented that she had always had her own children up, fed, and ready every morning. He admitted that he worked long hours and that he would not be available to assist the maternal great-aunt most days. In addition, T.T.H. testified that he was illiterate and that the maternal great-aunt had always *479 been the one to assist their children with homework. He said that he fully supported the decision to seek custody of the child.
The maternal great-aunt argues that the Marion County DHR discounted her as a relative resource solely on the basis that she takes a prescribed narcotic pain reliever on a daily basis. She states that the proper use of prescription medication should not disqualify an otherwise suitable caregiver from consideration as a relative resource. While we do not necessarily disagree that the proper use of prescription medication should not automatically disqualify one from consideration as a potential caregiver, we do not agree that the juvenile court's decision not to place the child in the custody of the maternal great-aunt was based solely on her use of a prescription medication. The home-study report stated that the maternal great-aunt reported taking up to three Lortab per day, depending on the level of her pain. Because Lortab is a combination of acetaminophen and hydrocodone, a narcotic pain reliever, the home-study evaluators expressed concern over the maternal great-aunt's ability to care for the child if she was taking that level of medication. The ability to care for the needs of the child, who was still an infant and would become an active toddler, was the proper focus of the home study, and we cannot agree that the concern raised in the home-study report was an invalid one.
Likewise, we are not convinced that the maternal great-aunt's biological relationship to the child requires a reversal of the juvenile court's judgment. Although in Ex parte W.T.M., 851 So.2d at 59-60, this court, in a plurality opinion, discussed the relative preference established by Ala. Code 1975, § 12-15-62(c), and the Adoption and Safe Families Act, codified, in part, at 42 U.S.C. § 671(a)(19), we do not agree with the maternal great-aunt that those statutes and Ex parte W.T.M. require a reversal in her favor in this particular case. In Ex parte W.T.M., this court, in a plurality opinion, discussed the relative preference established by Ala.Code 1975, § 12-15-62(c), and the Adoption and Safe Families Act, codified at 42 U.S.C. §§ 671 & 675. We concluded that the 1998 amendments to the Juvenile Justice Act, specifically Ala.Code 1975, § 12-15-62(c), incorporated the requirement in the Adoption and Safe Families Act that a state give a preference to a related caregiver that meets all state standards and requirements. § 671(a)(19).
The situation in Ex parte W.T.M. was markedly different than the situation in the present case. In Ex parte W.T.M., the child had been declared dependent some time in 1997 because her mother had serious substance-abuse issues and because the child was a "crack baby" when she was born. Ex parte W.T.M., 851 So.2d at 56 (quoting W.T.M. v. S.P., 802 So.2d 1091, 1092 (Ala.Civ.App.2001)). The father had suffered a stroke and was unable to care for the child on his own, so, once the father established his paternity in early 1998, he and his sister, S.B., petitioned for custody of the child. Id. The juvenile court denied the father and S.B.'s petition, ordering instead that the child remain in the custody of the Department of Human Resources their appeal from that judgment was untimely. Id. In May 1999, the father and another sister, V.T., and her husband, E.T. (collectively referred to as "the aunt and uncle"), moved to intervene in the child's dependency case and petitioned for custody. Id. In June 1999, the child's foster mother, S.P., also petitioned for custody of the child. Id. After a trial, the juvenile court awarded custody of the child to the foster mother; its decision was based on its application of the "material promotion" standard enunciated in Ex parte McLendon, *480 455 So.2d 863 (Ala.1984), to the aunt and uncle's petition. Id. at 56-57. On the aunt and uncle's appeal from that judgment, we reversed the juvenile court's judgment, ordering that it reconsider the evidence on remand and apply the best-interest standard to the aunt and uncle's custody petition. Id. at 57.
On remand, the juvenile court, as ordered, reconsidered its judgment, utilizing the best-interest standard; it again awarded custody of the child to the foster mother. Id. at 58. The aunt and uncle appealed, and the father filed a petition for the writ of mandamus; both the aunt and uncle and the father argued that the aunt and uncle were entitled to receive the relative preference and that they should be awarded custody instead of the foster mother. Id. In the plurality opinion, this court stated that the 1998 amendments to the Juvenile Justice Act incorporated the requirement in the Adoption and Safe Families Act that a state give a preference to a related caregiver that meets all state standards and requirements. Id. at 59. Based on that legal determination, this court reversed the judgment of the juvenile court and ordered that it give a preference to the aunt and uncle in determining the best interest of the child. Id. at 60.
In the present case, the child has been in the foster parents' home since only a few days after his birth. At the time of the shelter-care hearing, which would have been within 72 hours after the removal of the child from his mother's custody, see Ala.Code 1975, § 12-15-60, the Marion County DHR sought and received a judicial determination that reasonable efforts to reunify the child with his parents were not necessary. See Ala. Code 1975, § 12-15-65(m) (providing that DHR is not required to make reasonable efforts if a court determines that a parent has subjected a child to one of a list of particular aggravating circumstances, including exposing the child to substance abuse). According to Allie Tyra, the child's caseworker, the juvenile court also held a permanency hearing for the child within 30 days of that "reasonable efforts" determination, as required by § 12-15-65(n). Tyra reported that the permanency plan for the child had always been termination of parental rights and foster-parent adoption.
Although, according to Ex parte W.T.M., the Department of Human Resources and the juvenile court are required to give a preference to a related caregiver, nothing in either the federal or the state statutes requires that the related caregiver receive custody without regard to the best interest of the child and without an eye toward achieving permanency for the child. The federal act, in fact, is aimed at achieving permanency for children in a more expedient manner. 42 U.S.C. § 675(5)(E) (requiring a state welfare system, among other things, to file a petition to terminate parental rights if a child has been in foster care 15 out of the previous 22 months); see, generally, Kurtis A. Kemper, Annotation, Construction and Application by State Courts of the Federal Adoption and Safe Families Act and Its Implementing State Statutes, 10 A.L.R. 6th 173, 173 (2006); Thomas Wade Young & Jae M. Lee, "Responding to the Lament of Invisible Children: Achieving Meaningful Permanency for Foster Children," J. Kan. B. Ass'n 46, 47-48 & 52 (June/July 2003). Pursuant to both federal and state law, a juvenile court must consider the overarching best interest of each particular child that comes before it when making the difficult determinations that result from dependency and termination-of-parental-rights petitions. See 42 U.S.C. § 675(5) (defining "case review system" as a method *481 for assuring that each child's case plan is consistent with the best interest and needs of that particular child); Ex parte J.R., 896 So.2d 416, 423 (Ala.2004); and J.W. v. C.H., 963 So.2d 114, 120 (Ala.Civ. App.2007) (noting that, in dependency cases, "the primary concern ... is the best interests of the child"). In addition, a juvenile court may make any disposition that advances the best interest and welfare of the child when faced with determining the proper placement of a dependent child. Ala.Code 1975, 12-15-71(a); J.S.M. v. P.J., 902 So.2d 89, 94-95 (Ala.Civ.App.2004).
A related caregiver may, in some circumstances, be a suitable permanent alternative for a child; however, the relative preference does not require an automatic award of custody to a "fit and willing" relative or supplant the juvenile court's responsibility to determine whether that related caregiver is, in fact, the most appropriate placement to ensure permanency and stability in the child's life. See 42 U.S.C. § 671(a)(15)(C) & (E)(ii) (indicating that the underlying purpose of the Adoption and Safe Families Act is to secure permanency for children once reasonable efforts toward family reunification are either exhausted or are no longer required to be made). In the present case, when considering whether the maternal great-aunt should have custody, the juvenile court was faced not with a situation in which preservation of the parent-child relationship was the goal, as it clearly was in Ex parte W.T.M., but instead with one in which the juvenile court was simultaneously terminating the parental rights of the child's parents. Thus, we conclude that Ex parte W.T.M. does not itself compel reversal of the juvenile court's judgment.
The juvenile court in the present case was presented with a situation in which the child's mother had lost or relinquished custody of her older children and had continued a pattern of drug abuse that endangered this child during the pregnancy and at the time of the child's birth. When it determined that reasonable efforts to reunite this child with his mother were not necessary and determined that the Marion County DHR's suggested permanency plan of adoption by the child's foster parents was appropriate at the permanency hearing, the juvenile court considered the best interest of the child in light of the desire to achieve permanency in the child's life, as required by the Adoption and Safe Families Act and Alabama law. See 42 U.S.C. § 671(a)(15)(C) & (E)(ii); § 12-15-65(m) & (n). The maternal great-aunt's custody petition was considered with the same objectives in mind; that is, the juvenile court was called upon to determine which alternativecustodial placement with the maternal great-aunt or adoption by the foster parentswould promote the child's best interests and satisfy the child's need for permanency.
In making its determination regarding the maternal great-aunt's custody petition, the juvenile court was required to determine whether the maternal great-aunt was a "fit and willing relative" and whether placement with the maternal great-aunt would be in the child's best interest. We have recently explained, in the context of an appeal from the termination of parental rights, that a "fit and willing" relative is one who can care for the child's physical, emotional, mental, and other needs during the child's minority. J.B. v. Cleburne County Dep't of Human Res., 991 So.2d at 273, 283 (Ala.Civ.App.2008). The maternal great-aunt has health issues and, despite her willingness to parent the child, may lack the ability to care for the child throughout the remainder of his childhood.
The juvenile court observed the maternal great-aunt and was able to judge for itself how the maternal great-aunt presented *482 herself and to judge, based on the appearance and demeanor of the witnesses presented to it, which included the maternal great-aunt's adult daughters, the results of the maternal great-aunt's parenting skills. J.W. v. C.H., 963 So.2d 114, 119 (Ala.Civ.App.2007). In addition, the juvenile court could have considered the fact that placement with the maternal great-aunt might lead to continued contact between the child and his mother,[3] which would have been inconsistent in light of the determination that the mother and the child need not be reunited and the ultimate termination of the mother's parental rights. Finally, the juvenile court could have considered the fact that the child had not had any contact whatsoever with the maternal great-aunt or any other member of the mother's family; in fact, the only family the child knows is his foster family. In light of our standard of review, which requires us to assume that the juvenile court made the necessary factual determinations to support its judgment if those findings would be supported by the record, L.R.M. v. D.M., 962 So.2d 864, 874 (Ala. Civ.App.2007), we cannot conclude that the juvenile court erred when it determined that an award of the child's custody to the maternal great-aunt was not in the child's best interest and not the most appropriate means by which to secure stability and permanency for the child. We therefore affirm the denial of the maternal great-aunt's custody petition.
AFFIRMED IN PART; APPEAL DISMISSED IN PART.
THOMPSON, P.J., and PITTMAN and BRYAN, JJ., concur.
MOORE, J., concurs in part and concurs in the result, with writing.
MOORE, Judge, concurring in part and concurring in the result.
I concur in that part of the majority opinion concluding that the maternal great-aunt lacked standing to contest the termination of the mother's parental rights. I concur in the result as to the affirmance of the judgment denying the maternal great-aunt's petition for custody.
As I have recently expressed, juvenile courts should not consider the viability of placing a child with a relative in a hearing to terminate parental rights, but should make that determination at the permanency hearing. See A.D.B.H. v. Houston County Dep't of Human Res., [Ms. 2060699, March 21, 2008] ___ So.2d ___, ___ (Ala.Civ.App.2008) (Moore J., concurring in part and concurring in the result). At that hearing, the juvenile court should decide which of several permanent dispositions serves the best interests of the child and enter a judgment accordingly. See Ala.Code 1975, § 12-15-62(c). In the permanency hearing, if the Department of Human Resources ("DHR") advocates for a permanent disposition other than relative placement, the burden of proof rests with DHR to prove to the reasonable satisfaction of the juvenile court that a relative applying for custody of a child is not fit and/or that it would not be in the best interests of the child to place the child with the relative. A.D.B.H., ___ So.2d at ___.
In this case, by failing to consider placing the child with the maternal great-aunt at the permanency hearing and by considering her petition for custody in combination with the hearing to terminate parental rights, the juvenile court did not follow the *483 correct procedure; however, the maternal great-aunt does not raise that error as grounds for reversal and it appears that any error in this regard was cured by the subsequent hearing.
The maternal great-aunt argues that DHR did not present sufficient evidence of her unfitness. Although I believe that DHR did not have the burden of proving the maternal great-aunt's unfitness by clear and convincing evidence, see A.D.B.H., supra, our caselaw currently requires that level of proof. As such, I have reviewed the evidence in the record to determine if clear and convincing evidence supports the juvenile court's finding that the maternal great-aunt was not a fit person to receive and care for the child. See J.B. v. Cleburne County Dep't of Human Res., 991 So.2d 273, 283 (Ala.Civ.App. 2008). I believe the evidence was rather clear and one-sided that, despite her health problems and prescription-medication intake, the maternal great-aunt was capable of receiving and caring for the child and fulfilling the child's needs. See J.B., 991 So.2d at 283.
However, the evidence was equally clear and convincing that the maternal great-aunt could not or would not protect the child from the harm presented by the mother. See N.J. v. Madison County Dep't of Human Res., 980 So.2d 997 (Ala. Civ.App.2007) (plurality opinion) (defining "fit and willing relative").
The mother testified that it was a "great idea" for the maternal great-aunt to gain custody of the child and that, if the maternal great-aunt received custody, even though they no longer lived next door to one another, she would "probably" be over at the maternal great-aunt's house to see the child as often as she could. The mother also testified that although she had lost custody of three other children, all of whom had been adopted by paternal relatives, she still saw them every other Sunday and every Wednesday. The maternal great-aunt testified that she was "trying" to help the mother and that she would allow the mother to visit her home in the future if she "straightened out." This testimony indicates that if the child was placed with the maternal great-aunt, the child would in all likelihood be exposed to the mother, whose parental rights have been terminated for, among other things, exposing the child to substance abuse.
Because clear and convincing evidence supports a finding that the maternal great-aunt is not "fit" and "qualified to receive and care for the child," the juvenile court did not have to proceed to a determination of whether placing the child with the maternal great-aunt would serve the child's best interests. Accordingly, I do not believe that there is any need to address the maternal great-aunt's argument that she should have been given a custodial preference over the foster parents as required by Ex parte W.T.M., 851 So.2d 55 (Ala.Civ. App.2002), because that preference, if it exists at all, applies only to fit and qualified relatives. I, therefore, reserve any statement regarding the effect of that opinion for a more appropriate case.
NOTES
[1] In this particular case, the custody petition and the petition for termination of the mother's parental rights were decided by the juvenile court concurrently in one hearing. However, had the juvenile court properly considered the custody petition at a pre-termination permanency hearing, at which a juvenile court is required to determine the permanent plan for the child, including whether placement with a fit and willing relative is appropriate, the decision on the maternal great-aunt's custody petition would have come before the decision on the Marion County DHR's termination petition and would have been based on evidence concerning the maternal great-aunt's suitability without regard to the mother's fitness and the grounds for termination. See Ala.Code 1975, § 12-15-62(c), and A.D.B.H. v. Houston County Dep't of Human Res., [Ms. 2060699, March 21, 2008] ___ So.2d ___, ___ (Ala. Civ.App.2008) (Moore, J., concurring in part and concurring in the result).
[2] Because the child was born during the mother's marriage to one man but was the biological child of another man, the Marion County DHR acquired the consent of both the child's legal father and the child's biological father to the termination of their parental rights.
[3] Although the mother no longer lived next door to the maternal great-aunt at the time of trial, the maternal great-aunt did not indicate that she intended to prevent contact between the child and the mother.