MOORE, Judge.
T.E. (“the father”) appeals from a judgment of the Jefferson Juvenile Court (“the juvenile court”) denying his petition to gain sole physical custody of J.E. (“the child”) through a dependency proceeding.
The father and T.H. (“the mother”) met while both were serving in the military. Their relationship produced the child in 2001, but the relationship ended by the time the child was two years old. The mother eventually moved to Birmingham with the child and her two other children. The father remained in the military for some time before settling in Phoenix, Arizona, where he eventually married another woman. The father visited the child on occasion when the father was in Birmingham. The father agreed to pay the mother $800 per month as child support, but, after paying that amount for awhile, he began to buy the child clothes instead of sending the mother the full amount. Thereafter, the mother filed an action in which the father’s paternity of the child was adjudicated; the court in that action ordered the father to pay child support to the mother. The father abided by that court order by first paying an arrearage and then by assuming “normal” monthly child-support payments. In addition, the father covered the child on his health insurance.
The mother would sometimes let the child visit with the child’s paternal great-grandmother who resided in Birmingham. The paternal great-grandmother testified that the child and his clothing appeared dirty when he came to visit. The paternal great-grandmother also expressed concern that the child was small and did not appear to be eating well.
The child’s paternal grandmother testified that the child had complained to her that other children made fun of his dirty, smelly coat. The paternal grandmother stated that she had bought the child several coats so he would not have to wear unsuitable clothing. In addition, the paternal grandmother and her husband paid for the child to attend private school. The paternal grandmother also testified that, when the child was five years old, the mother had sometimes not picked the child up from school on time, the school had been unable to contact the mother, and the paternal grandmother had had to pay extra costs for after-school day care. The paternal grandmother also stated that the school had informed her that the child had missed 44 days of classes.
The paternal great-grandmother testified that the child had told her that he was afraid of Ty.H., whom the mother married in 2006, and that Ty.H. did not like the child. The father, the paternal grand *1170 mother, and- the paternal great-grandmother. all testified that the child had told them that Ty.H. would act mean when the mother was not around. The father testified that he tried to talk to the mother about the child’s statements but that the mother had told the father that there was nothing to worry about. Ja.H., the mother’s 16-year-old daughter who also resided with the mother and Ty.H., testified that she considered Ty.H. to be a “father figure” who was not mean or violent.
The paternal great-grandmother testified that, on one occasion in 2007 while she was bathing the child, she noticed a scar near the child’s groin area. The child informed her that the mother’s husband, Ty.H., had whipped him with a switch after discovering an electric-train set had been broken. Ty.H. admitted that he had whipped the child and the child’s half brother for lying about breaking a race-car set. Ty.H. would not admit that the scar on the child resulted from that incident, stating only that the scar appeared after the whipping. A photographer took photographs of the scar, which were placed into evidence. The photographer testified that the child told him that the child did not want to go back to live with the mother but wanted to stay with the paternal great-grandmother. According to the photographer, the child had stated that he did not want to return to the home of the mother because he did not like being yelled at or whipped.
The father stated that the child also had experienced a sore on his left thumb. The photographer took a picture of the child’s left thumb, which was also introduced into evidence. Both the father and the photographer testified that the sore appeared to be from a cigarette burn. In addition, the father testified that the child had had to have several stitches years earlier when he had been bitten in the face by a dog. The father testified that he had reported the mother to the Alabama Department of Human Resources on two occasions but that he had not been informed of the results of any investigation that might have been undertaken because he was not the child’s custodial parent.
The father testified that he suspected the mother may be using drugs but that he did not want to believe it. The mother tested positive for marijuana in October 2008, but she did not test positive in March 2009. Ty.H. tested negative on his drug tests, and he denied that he used drugs. However, the father testified that the mother’s brother had stated that he had observed Ty.H. using drugs in the home with the children present.
Although Ty.H. denied that he or the mother had interfered with the father’s visitation with the child, the father testified that he was often unable to contact the mother to arrange to see the child. The paternal grandmother also testified that she had been unable to visit with the child after she lost contact with the mother for an approximate two-year period. At some point, the mother placed stipulations on the father’s visitations that required him to provide two weeks’ notice of any intent to visit the child, a provision with which the father sometimes could not comply. The mother also informed the father that he would have to arrange visits through Ty.H. Both the father and Ty.H. testified about a mutual dislike for one another that had resulted in many “rough conversations” and some remarks that the father considered threats against his safety. The father presented evidence indicating that the mother and Ty.H. had withheld visitation from the father in November and December 2008 and that the mother had transferred the child to another school without the knowledge of the father.
In July 2008, the father filed a dependency petition alleging that the child was *1171 in need of care and supervision and requesting the juvenile court to transfer custody of the child to him. The juvenile court tried the case on March 31, 2009. As recorded in the juvenile court’s judgment, just before the taking of testimony, the mother and the father stipulated that the child was dependent because his custody was in controversy. See Ala.Code 1975, § 12-15-1(10)c.[1] Thus, the only issue before the juvenile court was the proper disposition of the custody of the child. See Ala.Code 1975, § 12-15-71. As to that issue, at the close of the evidence, the child’s guardian ad litem recommended that the child remain in the custody of the mother because the child loved the mother and his half siblings. The juvenile court entered a judgment on April 22, 2009, awarding the mother custody of the child and granting the father specified visitation rights.
On appeal, the father argues essentially that the juvenile court erred in placing the child with the mother. In dependency actions, the juvenile court may make any disposition of the custody of the child that advances the best interests and welfare of the child. B.H. v. Marion County Dep’t of Human Res., 998 So.2d 475, 481 (Ala.Civ.App.2008) (citing Ala. Code 1975, § 12-15-71(a), and J.S.M. v. P.J., 902 So.2d 89, 94-95 (Ala.Civ.App.2004)). “That, determination must come from the evidence and each case must be decided on its own facts.” In re Palmer, 387 So.2d 215, 216 (Ala.Civ.App.1980) (citing Borsdorf v. Mills, 49 Ala.App. 658, 275 So.2d 338 (1973)). This court may reverse a judgment determining the custody of a dependent child following a trial at which oral testimony is received only if no credible evidence supports the factual determination that such placement serves the best interests of the child. See J.P. v. S.S., 989 So.2d 591 (Ala.Civ.App.2008).
As outlined above, the father presented undisputed evidence indicating that, while the child was in the custody of the mother, the child had experienced several injuries, most notably a whipping by Ty.H. that scarred the child’s groin area; that the child had expressed fear of Ty.H. and had stated that Ty.H. acted mean to him when the mother was not around; that the mother downplayed any concerns regarding Ty.H.; and that, although the child loved the mother and his half siblings, the child preferred not to reside with the mother because he was yelled at and whipped. That evidence strongly indicates that it would not be in the best interests of the child to live in a home with Ty.H.
To counter that evidence, the mother presented the testimony of Ja.H. that she did not consider Ty.H. to be a violent or mean man and that she looked upon him as a father figure. However, Ja.H. did not testify as to how Ty.H. treated the child when the mother was not around. Ja.H. also testified that she had not observed Ty.H. spank the child, which he indisputably had done. Furthermore, Ja.H. did not contradict the testimony of the other witnesses that the child had stated a fear of Ty.H. and a preference not to reside with him. The guardian ad litem stated that the child said he loved the mother and the half siblings, but the guardian ad litem did not refute the evidence regarding the relationship between the child and Ty.H.
The undisputed evidence further showed that the mother had allowed the child to miss 44 days of school and that she sometimes had neglected to pick up the child *1172 after school. The undisputed evidence also showed that the child sometimes was not properly cleaned and wore unsuitable clothing. One witness testified that the child appeared undernourished. That evidence seriously undermines any finding that the mother is capable of meeting the basic needs of the child.
Inexplicably, the mother did not testify at trial. As a result, the record is totally devoid of any positive evidence regarding the care provided to the child by the mother. In fact, the record contains no evidence regarding the suitability of the home maintained by the mother, her financial status, her character, her mental and physical health, or her interpersonal relationship with the child, all factors a court must consider when assessing the best interests of the child. See Ex parte Devine, 398 So.2d 686, 696-97 (Ala.1981). Without such evidence, the juvenile court could not have properly determined that the best interests of the child would be served by remaining in the custody of the mother.
Although we do not necessarily agree with the father’s other arguments that the mother’s one positive drug test and alleged interference with the relationship between the father and the child further proves her unfitness to care for the child, we preter-mit any discussion of those issues because we conclude the juvenile court had insufficient evidence before it to reach its custody determination. We therefore reverse the juvenile court’s judgment and remand the case for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
BRYAN and THOMAS, JJ., concur.
THOMPSON, P.J., and PITTMAN, J., concur in the result, without writings.

. Section 12-15-102, Ala.Code 1975, part of the new Alabama Juvenile Justice Act ("the AJJA”), Ala.Code 1975, § 12-15-101 et seq., replaced Ala.Code 1975, § 12-15-1, and now defines "dependent child” without reference to a child "[w]hose custody is the subject of controversy.” Neither party argues that the AJJA applies to this case.